# 24-2239-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ATUL BHIWAPURKAR, AKA Sealed Defendant 2,

*Defendant,*

AMIT DAGAR, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANT-APPELLANT AMIT DAGAR

PATRICK J. SMITH
SELBIE L. JASON
MICHAEL K. SALA
CLARK SMITH VILLAZOR LLP
666 Third Avenue, 21st Floor
New York, New York 10017
(212) 377-0850

*Attorneys for Defendant-Appellant
   Amit Dagar*

CP COUNSEL PRESS   (800) 4-APPEAL • (334349)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION .................................................... 3

STATEMENT OF ISSUES ............................................................... 3

STATEMENT OF THE CASE ........................................................... 3

    A.    The Superseding Indictment .................................................. 4

    B.    The Conduct Of The Trial ..................................................... 6

          1.    The Government's Theory of the Case During Opening Statement ............................................................... 6

          2.    Evidence Concerning Dagar's Role in Pfizer's Paxlovid Clinical Trial ..................................................... 8

          3.    Evidence Concerning the Alleged Material Nonpublic Information .............................................. 10

          4.    Dagar's Options Trades .......................................... 12

          5.    The Theory of the Defense ...................................... 13

          6.    The Government's Uncharged Alternative Theory of Guilt .................................................................... 14

          7.    Venue ..................................................................... 19

    C.    Verdict, Sentencing, and Motion for Bail Pending Appeal ................ 20

SUMMARY OF ARGUMENT .......................................................... 21

STANDARD OF REVIEW ............................................................... 23

ARGUMENT ................................................................................ 23

I.    THE GOVERNMENT CONSTRUCTIVELY AMENDED THE SUPERSEDING INDICTMENT ............................................... 23

i

A.  A Constructive Amendment Occurs When The Jury Is Permitted To Convict On Bases Broader Than Those Charged In The Indictment .................................................................23

B.  The District Court Erroneously Permitted The Government To Argue An Uncharged Theory Of Guilt To The Jury ....................26

II.  THE GOVERNMENT FAILED TO PROVE VENUE IN THE SDNY.................................................................................................33

A.  There Was No Evidence Of An Act In Furtherance Of The Charged Offenses Occurring In The SDNY ........................................35

1.  Nasdaq's Corporate Headquarters Do Not Establish an Act in Furtherance of the Charged Offenses in the SDNY .................................................................................36

2.  The Corporate Headquarters of the Sellers and Their Clearing Firms Do Not Establish An Act in Furtherance of the Charged Offenses in the SDNY .................41

B.  There Was Insufficient Evidence Of Dagar's State Of Mind As To Venue ..........................................................................43

1.  Knowingly or Intentionally....................................................43

2.  Foreseeability .........................................................................45

CONCLUSION .......................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Grossman v. Young*,
    70 F. Supp. 970 (S.D.N.Y. 1947) ...........................................................39

*Hall v. United States*,
    58 F.4th 55 (2d Cir. 2023) .....................................................................23

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
    890 F.3d 60 (2d Cir. 2018) ....................................................................37

*SEC v. Thrasher*,
    No. 92-Civ-6987, 1993 WL 37044 (S.D.N.Y. Feb. 8, 1993) ...............39

*Smith v. United States*,
    599 U.S. 236 (2023) ..............................................................................35

*Stirone v. United States*,
    361 U.S. 212 (1960) ................................................................. 24, 30, 31

*United States v. Bezmalinovic*,
    962 F. Supp. 435 (S.D.N.Y. 1997) ............................................. *passim*

*United States v. Chow*,
    993 F.3d 125 (2d Cir. 2021) ....................................................... 40, 41, 49

*United States v. D'Amelio*,
    683 F.3d 412 (2d. Cir. 2012) .................................................................23

*United States v. Davis*,
    689 F.3d 179 (2d Cir. 2012) ..................................................................47

*United States v. Geibel*,
    369 F.3d 682 (2d Cir. 2004) ........................................................... 39, 40

*United States v. Hassan*,
    578 F.3d 108 (2d Cir. 2008) ........................................................... 26, 33

*United States v. Khalupsky*,
    5 F.4th 279 (2d Cir. 2021).............................................................. 34, 49

*United States v. Kim*,
    246 F.3d 186 (2d Cir. 2001) ......................................................... 33, 47

*United States v. Miller*,
 471 U.S. 130 (1985) ........................................................................24

*United States v. Milstein*,
 401 F.3d 53 (2d Cir. 2005) ............................................... 24, 25, 28, 33

*United States v. Mollica*,
 849 F.2d 723 (2d Cir. 1988) ........................................................ 24, 29

*United States v. Parrilla*,
 No. 13-CR-360, 2014 WL 7496319 (S.D.N.Y. Dec. 23, 2014), *aff'd
 sub nom. United States v. Tang Yuk*, 885 F.3d 57 (2d Cir. 2018) .........................45

*United States v. Ramirez-Amaya*,
 812 F.2d 813 (2d Cir. 1987) ..........................................................46

*United States v. Reed*,
 773 F.2d 477 (2d Cir. 1985) .................................................... 45, 46, 47

*United States v. Riley*,
 638 F. App'x 56 (2d Cir. 2016) ............................................... 39, 40, 49

*United States v. Roshko*,
 969 F.2d 1 (2d Cir. 1992) ........................................................... 26, 33

*United States v. Svoboda*,
 347 F.3d 471 (2d Cir. 2003) ................................................... *passim*

*United States v. Tzolov*,
 642 F.3d 314 (2d Cir. 2011) .............................................................23

*United States v. Wozniak*,
 126 F.3d 105 (2d Cir. 1997) .................................................... 24, 25, 32

*United States v. Zingaro*,
 858 F.2d 94 (2d Cir. 1988) .............................................. 24, 29, 30, 31

*Williams v. Binance*,
 96 F.4th 129 (2d Cir. 2024) ...........................................................37

## Statutes & Other Authorities:

U.S. Const. amend. V ...........................................................................24

U.S. Const. amend. VI .........................................................................33

U.S. Const. art. III, § 2, cl. 3 .............................................................33

15 U.S.C. § 78aa(a) ............................................................................................ 33

18 U.S.C. § 3231 ................................................................................................. 3

28 U.S.C. § 1291 ................................................................................................. 3

Fed. R. App. P. 4(b)(2) ................................................................................... 3, 21

*The Cboe wants to 'debunk' some 0DTE myths*, Financial Times (Apr. 15,
    2024) .............................................................................................................. 51

# INTRODUCTION

Amit Dagar was a statistical programmer at Pfizer, Inc. ("Pfizer") where he contributed his programming and coding skills to Pfizer's Paxlovid clinical trial as a blinded member of the trial team. He was convicted of insider trading and conspiracy following trial in the Southern District of New York (SDNY). There are two grounds on this appeal to reverse the jury's verdict.

*First*, the district court's refusal to frame for the jury the actual allegations in the superseding indictment after the government changed its theory of guilt resulted in a constructive amendment. Filed less than a month before trial, the superseding indictment unequivocally charged Dagar with insider trading while in possession of material nonpublic information *about the results* of the Paxlovid clinical trial. During its opening statement, the government made clear its theory of the case: Dagar committed insider trading while in possession of material nonpublic information about the results of the Paxlovid trial that he acquired on November 4, 2021. In summation, however, the government pivoted. The government pointed to other preliminary information about the clinical trial, which was generally available to Pfizer employees—information that had nothing to do with the results—such as trial objectives, design, methodology, milestones, and timeline. The government then urged the jury to convict Dagar of insider trading and conspiracy based on evidence that he possessed this *other* alleged material

nonpublic information, even if the jury did not believe that Dagar knew the results of the Paxlovid trial. That was not the crime charged in the superseding indictment, and the government's tactics impermissibly broadened the bases for conviction. The district court then committed reversible error by denying Dagar's requests for a clarifying instruction as to the nature of the material nonpublic information charged in the superseding indictment and to provide the jury with a copy of the superseding indictment during deliberations. This resulted in a constructive amendment requiring reversal of Dagar's convictions.

*Second*, the government brought its case against Dagar in the wrong district. The evidence at trial demonstrated that all acts related to the alleged insider trading and conspiracy occurred outside of the SDNY. Dagar placed his trades while at home in New Jersey, Dagar's co-defendant, Atul Bhiwapurkar, with whom he allegedly conspired, lived in California, and the exchanges on which Dagar and Bhiwapurkar's trades took place maintained their trading engines—the location where the trades were matched, executed, and consummated—in New Jersey. The government's arguments that venue was proper in the SDNY must be rejected because the corporate headquarters of an exchange, a seller of securities, and the firms providing ministerial functions to those sellers are not sufficient to establish that any *act* in furtherance of the charged offenses occurred in the SDNY. And even if the government had established that an act in furtherance of the charged

offenses occurred in the SDNY, the government still failed to present evidence from which it could be inferred that Dagar knew, intended, or could have foreseen that such an act would occur in the SDNY.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. That court entered a final judgment of conviction on August 21, 2024. SPA-8-15. Dagar filed a timely notice of appeal on August 19, 2024 which, pursuant to Federal Rule of Appellate Procedure 4(b)(2), is treated as filed on August 21, 2024. A-55-56. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether Dagar's convictions must be reversed because the superseding indictment was constructively amended.

2.      Whether Dagar's convictions must be vacated and the case remanded for a new trial because the government failed to establish venue in the SDNY.

## STATEMENT OF THE CASE

The government alleged that Dagar traded on Pfizer stock options while in possession of material nonpublic information about the positive results of Pfizer's Paxlovid clinical trial and charged him with securities fraud and conspiracy to commit securities fraud. A-34-43. The jury convicted Dagar on both counts. A-227. The U.S. District Court for the Southern District of New York (Carter, J.)

3

sentenced Dagar principally to nine months' imprisonment, SPA-10, and granted bail pending this appeal, A-259.

### A.     The Superseding Indictment

On June 29, 2023, the original indictment against Dagar was unsealed. A-22. It alleged that Dagar engaged in insider trading on November 4, 2021 when he "obtained MNPI about the results of Pfizer's clinical trial of Paxlovid and then utilized that MNPI to trade Pfizer stock options." *Id.* The original indictment alleged that Dagar "further provided MNPI about the Paxlovid results to Bhiwapurkar with the intent that Bhiwapurkar would likewise trade on that information." *Id.*

The government filed a superseding indictment on December 13, 2023, less than one month before trial. A-34-43. The superseding indictment removed Bhiwapurkar as a defendant, condensed the original securities fraud counts into one count (Count One), and kept the conspiracy to commit securities fraud count (Count Two). *Id.* The superseding indictment similarly alleged that Dagar possessed material nonpublic information about the results of the Paxlovid trial: "[O]n or about November 4, 2021, Dagar learned that Pfizer was stopping the relevant study because the results were positive, and that a press release would be issued the next day about the results." A-35. And, while in possession of this material nonpublic information, "[l]ater that same day, and while that information

4

remained confidential, Dagar purchased short-dated call options in Pfizer stock." *Id.* The only alleged source of material nonpublic information was a Microsoft Teams chat between Dagar and his manager which allegedly showed "that the outcome of the trial was positive and that they were 'screwed' because the positive results meant they would have a 'lot of work' to do" and "that there would be a press release about the trial's results the following day." A-38.

Indeed, every single allegation contained in the superseding indictment relating to material nonpublic information concerned the positive results of the Paxlovid trial and forthcoming press release about which Dagar allegedly learned on November 4, 2021:

- "[O]n or about November 4, 2021, DAGAR learned that Pfizer was stopping the relevant study *because the results were positive*, and that a press release would be issued the next day about the results." A-35 (emphasis added).

- "On or about the morning of November 4, 2021, DAGAR's supervisor ('Witness-1') sent DAGAR an electronic message that indicated, in sum, that Witness-1 had learned the outcome of the drug trial, *that the results were positive*, that DAGAR should prepare for some hard work ahead, and that a press release would be issued the next day." *Id.* (emphasis added).

- Dagar "nevertheless *learned information about the results of the relevant study when certain information was inadvertently disclosed to his manager*, Witness-1, who then informed DAGAR of developments relating to the trial." A-36-37 (emphasis added).

- "Witness-1 was stating to DAGAR, in sum and substance, *that the outcome of the trial was positive* and that they were 'screwed' because the positive results meant they would have a 'lot of work' to do. DAGAR also learned, in sum and substance, that there would be a press release about the trial's results the following day." A-38 (emphasis added).

- "In an interview with FBI agents on or about January 18, 2023, AMIT DAGAR, the defendant, acknowledged, in sum and substance, and among other things, that he had purchased Pfizer stock options during the relevant time period, *knowing that results of the Paxlovid trial were about to be publicly released*.  DAGAR further stated that *he had a hunch that the results were going to be positive*."  A-40 (emphasis added).

### B.    The Conduct Of The Trial

Trial commenced on January 9, 2024 in the U.S. District Court for the Southern District of New York before the Honorable Andrew L. Carter, Jr.

### 1.  The Government's Theory of the Case During Opening Statement

The government's opening statement mirrored the superseding indictment and argued that the material nonpublic information at issue was the positive results of Pfizer's Paxlovid trial.  The government argued that Dagar engaged in insider trading while in possession of material nonpublic information about the positive results of the Paxlovid clinical trial which he obtained on November 4, 2021 and engaged in a conspiracy to commit insider trading by tipping Bhiwapurkar regarding that same material nonpublic information about the results.  A-58-61; A-63-64.

The first sentence of the government's opening statement made clear the nature of the material nonpublic information on which the government asked the jury to focus: "For a pharmaceutical company, a company that makes prescription drugs, there is no more important information than whether a new drug works."  A-

58. And the government argued that this was the material nonpublic information that Dagar used to commit insider trading:

> Information about the drug called Paxlovid was a closely guarded secret at Pfizer. *But when Pfizer found out that the drug was overwhelmingly successful, overwhelmingly effective, a couple of Pfizer employees got inside information a little earlier than they were supposed to.* One of those people is in this courtroom. This is Amit Dagar, the defendant. And we are here today because when he learned *that confidential information*, he used it to commit a crime called insider trading.

A-58-59 (emphases added). The government traced the allegations of the superseding indictment as to the flow of this material nonpublic information about the results of the Paxlovid trial to Dagar: a small team of Pfizer employees learned the results of the Paxlovid trial; a Pfizer supervisor mistakenly emailed those results to Dagar's supervisor; and Dagar's supervisor sent chat messages to Dagar including that "Pfizer had gotten the outcome, meaning the outcome they had been hoping for, overwhelming efficacy," "they had a lot of work lined up, and that a press release would be issued the very next day." A-60-61. And, according to the government, "[a]t that point, the defendant had confidential, nonpublic information that would have been extremely meaningful to any regular investor deciding whether to buy or sell Pfizer stock." A-61.

Based on that information, "[o]n the same day he learned all of this, before the news was released to the public, the defendant went and purchased Pfizer stock options that would make money if, and only if, Pfizer stock went up." *Id.* In its

opening, consistent with the superseding indictment, the government did not characterize any fact or circumstance prior to November 4, 2021 as material nonpublic information.

### 2. Evidence Concerning Dagar's Role in Pfizer's Paxlovid Clinical Trial

Pfizer began developing the Paxlovid drug for the treatment of COVID-19 in 2020.  A-70.  Pfizer conducted different clinical trials of Paxlovid regarding safety, risk factors, and efficacy.  A-72-73.  In July 2021, Pfizer began enrolling patients in a high-risk clinical trial to determine whether Paxlovid would significantly reduce the rate of hospitalization and death due to COVID-19 in a high-risk population.  A-73-74.  This high-risk efficacy clinical trial was a double-blind study which meant that neither patients nor Pfizer investigators, staff, or clinical study team members knew which patients entered into the trial received the active drug and which patients received a placebo.  A-75.  The vast majority of Pfizer employees working on this Paxlovid clinical trial were blinded team members except for a small unblinded team responsible for monitoring safety data.  *Id*.  Blinded team members did not know whether or not a patient was receiving Paxlovid or a placebo, *id.*, and therefore could not know or predict the results of the trial, A-97.

Pfizer's high-risk efficacy clinical trial was governed by written protocol developed by the Senior Director and Medicine Team Lead and Global Clinical Lead for Paxlovid.  A-67; A-77; *see also* A-297; A-338; A-337.  These written

protocols outlined the objectives, design, and procedures of the clinical trial, A-104; A-305-08; A-340; A-344-46, described the clinical trial methodology and analysis, A-68; A-77; A-84-87; A-312-25; A-341-44; A-350-53, explained reporting milestones of the clinical trial such as the sentinel cohort safety review, proof of concept assessment, and interim analysis, A-80-85; A-107-111; A-307, and set forth the anticipated timeline for the clinical trial and possible outcomes, A-89; A-121-22; A-337.

While statistical programmers had access to these written protocols which were confidential Pfizer documents, A-77-78; A-86, these written protocols did not contain any information about the results of the clinical trial, *see* A-297-336; A-338-53; *see also* A-95-96. And while the written protocols of the clinical trial were confidential to Pfizer, the fact that the clinical trials were ongoing was publicly posted along with the conduct of those trials. A-96; A-98. Pfizer did not deem the foregoing information to be material nonpublic information as—unlike with the Paxlovid results—Pfizer did not affirmatively act to restrict the trading of the Pfizer employees who possessed this information. A-99-101. Indeed, the results of the trial were unknown within Pfizer before the evening of November 3, 2021, A-102; A-123, after which Pfizer imposed a trading restriction on the employees who received the results, A-99-101.

Dagar was a Senior Statistical Programming Lead at Pfizer and worked on Pfizer's high-risk efficacy Paxlovid clinical trial. A-69; A-72; A-136. He was a blinded member of the team and, as a result, did not have access to—and, by design, was walled off from—the results of the clinical trial. *See* A-75. In Dagar's role as a statistical programmer, he wrote code and set up programs in order for other Pfizer employees in different roles to conduct their analysis pursuant to the trial's written protocols. A-93. Dagar had no role in analyzing, interpreting, making judgments about, or drawing conclusions from the blinded trial data. A-94; A-103-04.

### 3. Evidence Concerning the Alleged Material Nonpublic Information

On November 4, 2021 Dagar's supervisor, Kawleen Oberoi, received an email mistakenly sent by a colleague that advised Oberoi of the positive results of the Paxlovid study. A-287. As a blinded team member, Oberoi should not have been exposed to the results. Oberoi sought guidance from a manager who instructed him: "Please do not reach out to anyone else to discuss until the results are made public." A-359. Oberoi then initiated a Microsoft Teams chat with Dagar:

**Oberoi:** we got the outcome

**Oberoi:** lag gayee hamari[1]

**Dagar:** oh really

**Oberoi:** lot of work lined up

**Oberoi:** Yeah . screwed

**Oberoi:** have to find the details

**Dagar:** officially kal pata chalega ?[2]

**Oberoi:** press release tomorrow

**Oberoi:** we may know today

**Dagar:** ok

**Oberoi:** since people will ask for un-blinded results

**Dagar:** yeah

**Dagar:** kind of exciting

A-288-89.  Dagar did not seek out this information and did not have the same context as Oberoi to understand what Oberoi was referring to by using the word "outcome."

Oberoi was unable to confirm that he intended to convey to Dagar that the "outcome" was positive; instead, Oberoi indicated that his intent was merely to

---

[1]  "[W]e are screwed" in Hindi.  A-124.
[2]  "Is it tomorrow that we will know officially" in Hindi.  A-127.

11

think about the work to be done in the days ahead.  A-134.  Oberoi confirmed that there would have been a lot of work for statistical programmers whether the results were positive or negative, A-135, and that Pfizer would have issued a press release whether the results were positive or negative, A-132-33.  And, the day after Oberoi sent this message to Dagar about an "outcome," Dagar—upon learning of the positive results for the first time from a CNN article—expressed genuine surprise and excitement: "Wow, god dang . . . Thats amazing results . . This could be game changer in fight against COVID."  A-358.

### 4. Dagar's Options Trades

On November 4, 2021, Dagar used his Fidelity account to purchase 665 Pfizer call options for a total of $8,773.20.  A-354; A-262-64.  Dagar purchased these call options in three tranches: 200 options with a strike price of $44 set to expire the next day on November 5, 2021 (for $1,894.27); 265 options with a strike price of $45.50 set to expire a week later on November 12, 2021 (for $3,344.66); and 200 options with a strike price of $46 set to expire two weeks later on November 19, 2021 (for $3,534.27).  A-354.  Dagar then sold those stock options from his Fidelity account on four separate occasions: 200 options on November 5, 2021 for $72,832.40; 265 options on November 12, 2021 for $113,820.53; 100 options on November 17, 2021 for $45,882.61; and 100 options on November 19,

2021 for $49,099.65.  A-355; A-264-70.  These trades resulted in total profits of $272,861.99.  A-355.

### 5. The Theory of the Defense

Oberoi's Microsoft Teams chat with Dagar on November 4, 2021, A-288-93, did not convey the results of the Paxlovid trial.  After Oberoi received the email from his supervisor with the positive results (an email Dagar never saw), A-287, Oberoi immediately contacted a manager who directed him not to "reach out to anyone else to discuss until the results are made public," A-359.  So, writing to Dagar minutes later, Oberoi conveyed that there was an "outcome" and a press release would be issued the next day.  A-288-89.  Oberoi did *not* convey whether the outcome or the press release contained positive or negative results.  A-288-93.  And while Oberoi wrote that there was "[a] lot of work lined up," there would have been "[a] lot of work" whether the results were positive or negative.  A-125-26.  Once the results were made public the following day, Dagar expressed clear surprise upon learning them: "Wow, god dang . . . Thats amazing results . . This could be game changer in fight against COVID."  A-358.

The nature of Dagar's trades was also inconsistent with criminal intent. Dagar purchased the Pfizer stock options on November 4, 2021 in an account in his own name, A-261, and purchased a volume of options that was consistent with his historical trading patterns, A-151-52.  Dagar also purchased certain tranches of

13

options which were less risky and more expensive than other options available to purchase at that time. A-153-56. Dagar would have received "substantially" more profit if he had taken all of the money he used to invest in the three tranches ($8,773.20) and only purchased the tranches of options with a strike price of $44 set to expire the next day on November 5. *Id.*; A-354. But because Dagar did not know the Paxlovid results, he hedged his bets and purchased more expensive positions in longer-termed options at his usual bet size. *See* A-156-57.

### 6. The Government's Uncharged Alternative Theory of Guilt

Apparently uncertain that the Microsoft Teams chat, A-288, together with Oberoi's testimony, adequately supported its theory, the government pivoted during its main summation and argued an alternative theory of guilt based upon evidence distinct from the alleged knowledge of the results of the Paxlovid trial. This included evidence, admitted as background, that Dagar would have known about or had access to confidential information regarding the trial's safety and early effectiveness milestones, internal Pfizer meetings being held to prepare for regulatory submissions, and the confidentiality of Pfizer information generally, *see, e.g.*, A-72-86; A-90; A-92; A-105-106; A-107-11; A-113; A-115-18, as well as written protocols marked "confidential" describing the clinical trial and analysis that would be done during the trial but not reflecting any information about the trial data or trial results, *see, e.g.*, A-297-336; A-337; A-338-53; A-86; A-90; A-

113. The superseding indictment did not allege that any of this background information was material nonpublic information in Dagar's possession when he placed his options trades on November 4, 2021.

In reliance on this evidence supporting an uncharged theory, during summation and rebuttal, the government argued that,

> even before Mr. Oberoi told [Dagar] the outcome of the interim analysis on November 4 [i.e., the results], the defendant had a lot of material, nonpublic information about Paxlovid because of his job at Pfizer. I'm going to walk through some of this inside information because it is critically important information that the defendant knew when he purchased Pfizer call options on November 4.

A-183. The government then listed Pfizer information that was generally known to members of the Paxlovid clinical trial team—none of which involved the positive results of the Paxlovid study—including "what milestones Paxlovid had cleared during the trial" (such as the sentinel cohort safety review and proof-of-concept assessment), the details of those milestones, "when the trial could or was going to end," "whether Paxlovid was proving to be safe and effective," "written plans and protocols that were confidential within Pfizer," the interim analysis process and the possible outcomes, the meetings of Pfizer's data monitoring committee, and the timelines for different possible scenarios during the ongoing Paxlovid trial. A-184-92. The government concluded: "So all of this information was inside information that the public did not know." A-189. None of this information, however, was the positive results of the Paxlovid trial.

15

The government then invited the jury to convict Dagar based on this alternative theory of the nature of the material nonpublic information:

> *Even if the defendant did not know for certain that the results were overwhelming efficacy, he is still guilty of insider trading.* Again, this is so important. You will excuse me. I have to repeat it. *Even if the defendant did not know for certain that the results were overwhelming efficacy, he is still guilty of insider trading.* Because without question, on November 4 he knew that it cleared the safety milestone and the proof of concept assessment. He knew the DMC had met the night before to decide and that there was only one possible outcome of four. And he knew that in the event of overwhelming efficacy, a press release would be issued, whatever that might be, the next day. On November 4, even just this information was still material nonpublic information. *To trade on even just this information is still cheating. It's still insider trading.*

A-193-94 (emphases added). And the government doubled down in rebuttal:

> You have seen evidence of the defendant learning and receiving confidential information, information that any outsider investor would have loved to have. He knew the Paxlovid drug trial had passed a safety milestone. He knew it had passed a milestone about effectiveness. And he knew, on November 4, that a press release would come out the very next day with the results. *Just that information, taken together, is material nonpublic information . . . you can convict based on the material nonpublic information that I have just described.*

A-212-13 (emphasis added).

Dagar objected to the government's presentation of this alternative theory of guilt on the basis that it constructively amended the superseding indictment or, in the alternative, caused a prejudicial variance. A-44-47. Dagar requested that the district court provide a copy of the superseding indictment to the jury during their

16

deliberations and requested a jury instruction that described the material nonpublic information alleged in indictment:

> Request No. 2 (The Indictment): We propose adding the following sentence at the beginning of the second paragraph:
>
> Before you begin your deliberations, you will be provided with a copy of the Indictment. As I previously described to you, the indictment is not itself evidence. It simply contains the charges that the government is required to prove to the satisfaction of the trial jury beyond a reasonable doubt. Because you will receive a copy of the indictment, I will not read it in its entirety to you at this time.
>
> Request No. 5 (Count One: Securities Fraud, First Element: The Insider Trading Scheme): We propose adding the following paragraph to the end of the instruction:
>
> In this case, a Grand Jury returned an indictment alleging that the material nonpublic information possessed by the Defendant at the time he traded was that Pfizer was stopping the Paxlovid study because the results of the interim analysis were positive, and that a press release would be issued the next day about those positive results. Thus, in order for the Government to prove that the Defendant committed securities fraud, you must be satisfied beyond a reasonable doubt that the Defendant knew that Pfizer was stopping the Paxlovid study, that the results of the Paxlovid interim analysis were positive, and that a press release would be issued the next day about those positive results.

A-47. The government opposed both requests. A-166-69; A-176; A-208-10.

The district court denied Dagar's requests, did not provide the jury with a copy of the superseding indictment, and declined to give Dagar's proposed instruction as to the nature of the material nonpublic information charged. A-176; A-211. Instead, the district court gave the following instruction, which failed to advise the jury of the specific allegations in the superseding indictment:

17

For purposes of these charges, an insider is a person who possesses material nonpublic information about a publicly traded company by virtue of a relationship that involves a duty of trust and confidence. Such an insider has a legal duty, known as the duty of trust and confidence, not to disclose to anyone outside the company financial or other nonpublic information about the company that the company treats as confidential and has informed the insider should be treated as confidential. When a person has such "inside information" and his position of trust and confidence prohibits him from disclosing that information, the law forbids him from buying or selling the securities in question. An insider may not trade on the basis of material nonpublic information, because the law forbids corporate insiders from taking unfair advantage of uninformed shareholders and using "inside information" for personal advantage.

The indictment alleges that the defendant was an insider at Pfizer who learned material nonpublic information through his work and traded based on that information in breach of a duty of trust and confidence he owed to Pfizer as an employee.

A-219-20; *see also* A-221-22 (instructing the jury as to the general definitions of "material" and "nonpublic").

The district court also prohibited Dagar from referencing specific allegations from the indictment in his summation. A-179. The jury was therefore left with generalized jury instructions which did not specify the charges in the superseding indictment with respect to the nature of the material nonpublic information charged, i.e., material nonpublic information about the positive results of the Paxlovid study that Dagar allegedly obtained on November 4, 2021 and not any other information about the Paxlovid clinical trial learned by Dagar in his role as a Pfizer employee. A-216-23; A-48-53.

18

### 7. Venue

None of the options trades at issue were placed from the SDNY. Dagar lived in New Jersey, worked for Pfizer from his home in New Jersey, and placed his trades while at home in New Jersey. A-128; A-130-31. Dagar purchased the Pfizer stock options on November 4, 2021 in his Fidelity account, A-263; A-284, and Fidelity is a brokerage firm with a Rhode Island address, A-271. Bhiwapurkar resided in California. A-162. While Bhiwapurkar traded through an account at Morgan Stanley, the account was maintained at a branch office in California. A-272. The record is silent as to any act in furtherance of Bhiwapurkar's trades, by either him or Morgan Stanley, that took place in the SDNY.

Trade execution took place on several options exchanges, including Nasdaq BX, Nasdaq Options Market, and Nasdaq GEMX. A-356-57. Nasdaq executive offices and corporate headquarters are in New York, New York, in the SDNY. A-356. Trade execution, however—when Dagar and Bhiwapurkar's buy orders were matched with sellers—took place on Nasdaq servers located in New Jersey. A-149-50; A-157-60; A-163-64.

There was no evidence of any direct relationship with any sellers, or that Dagar undertook any act to induce any sellers to transact. One seller, HRT Financial, reported to regulators an address in the SDNY. A-286. There was otherwise no evidence that HRT Financial placed its sell order from the SDNY.

According to the government's own expert witness, Peter Melley, sophisticated market participants maintain their own servers in New Jersey near Nasdaq's servers to reduce latency in order execution. A-158-59.

Clearing and settlement services provided to the sellers were provided by several clearing firms, including Goldman Sachs and BofA Securities, which maintained corporate offices and a computer server in the SDNY. A-356-57; A-137. While clearing and settlement services are "necessary parts" of an options trade, A-141, they are ultimately back-office "recordkeeping" and "ministerial functions" only provided after a trade has been matched, executed, and consummated, *id.*, A-145-46, A-160.

The record was devoid of evidence that Dagar had any knowledge of where Bhiwapurkar traded or through which firm; the order routing or matching process; the location of any exchange; the location of any seller; or anything at all to do with clearing and settlement services. Retail traders like Dagar—as opposed to sophisticated market participants—would not understand the process of the clearing and settlement of an options trade. A-145-46.

### C. Verdict, Sentencing, and Motion for Bail Pending Appeal

After a five-day trial, the jury found Dagar guilty on both the securities fraud and conspiracy to commit securities fraud counts. A-227. On February 8, 2024, Dagar moved for judgment of acquittal on the basis that the evidence presented at

trial was insufficient to sustain Dagar's convictions for securities fraud and conspiracy to commit securities fraud and insufficient to establish venue in the SDNY. A-15. The district court denied the motion on May 23, 2024. SPA-1-7.

On August 6, 2024, the district court sentenced Dagar to nine months' imprisonment to be followed by three years of supervised release. A-229. On August 21, 2024, the district court entered Judgment against Dagar imposing the sentence and ordering Dagar to forfeit $272,861.99 "representing the amount of proceeds traceable to the commission of said offenses." SPA-10-11; SPA-15. Dagar filed a timely notice of appeal on August 19, 2024 which, pursuant to Federal Rule of Appellate Procedure 4(b)(2), was treated as filed on August 21, 2024. A-55-56.

On August 27, 2024, Dagar moved for bail pending appeal. A-20. The district court held two hearings and ordered supplemental briefing regarding the venue issue. A-230; A-246-47; A-252-60; *see also* A-20. During the second hearing, on October 9, 2024, the district court held that "it's possible that the circuit could decide [the venue issue] the other way" such that a substantial question existed for appeal and granted Dagar's motion. A-255; A-259.

## SUMMARY OF ARGUMENT

1. Dagar's convictions must be reversed because the superseding indictment was constructively amended, which is a *per se* violation of the Fifth Amendment.

The superseding indictment charged one theory of wrongdoing based exclusively on material nonpublic information that Dagar allegedly learned on November 4, 2021 related to the positive results of the Paxlovid study and forthcoming press release. During trial, the government introduced an alternative theory of liability based on other information Dagar allegedly learned before November 4, 2021. The government then argued that the jury could convict Dagar based on this different theory and evidence, even if it found that he did not know the results of the Paxlovid trial. The district court erred when it refused to provide the jury with a copy of the superseding indictment and give an instruction that accurately described the charged offense. The government's conduct and district court's error constructively amended the superseding indictment, requiring reversal.

2. Dagar's convictions must be vacated and the case remanded for a new trial in a district where venue is proper because the government failed to prove venue by a preponderance of the evidence. No reasonable jury could have found by a preponderance of the evidence (i) that an act in furtherance of the charged offenses occurred in the SDNY, and (ii) that Dagar knew or intended that such an act would occur in the SDNY or that it was foreseeable to Dagar that such an act would occur in the SDNY. *See United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003). The Court should vacate Dagar's convictions and remand the case for a new trial in a district where venue is proper.

22

## STANDARD OF REVIEW

This Court reviews questions of law *de novo*. *Hall v. United States*, 58 F.4th 55, 59-60 (2d Cir. 2023). Dagar's constructive amendment and venue challenges are legal questions reviewed *de novo*. *United States v. D'Amelio*, 683 F.3d 412, 416 (2d. Cir. 2012) (constructive amendment); *Svoboda*, 347 F.3d at 482 (venue). This Court reviews "the sufficiency of the evidence as to venue in the light most favorable to the government, crediting 'every inference that could have been drawn in its favor.'" *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (citation omitted). At trial, the government needed to establish venue by a preponderance of the evidence. *Id.*

## ARGUMENT

## I. THE GOVERNMENT CONSTRUCTIVELY AMENDED THE SUPERSEDING INDICTMENT

This Court should reverse Dagar's convictions and order a new trial because, following the government's mid-trial alteration of its theory of guilt, the district court's failure to provide a copy of the superseding indictment or instruct the jury on the crime as charged constructively amended the superseding indictment.

### A. A Constructive Amendment Occurs When The Jury Is Permitted To Convict On Bases Broader Than Those Charged In The Indictment

The Fifth Amendment requires a defendant to be charged by indictment. U.S. Cost. amend. V. A defendant has the "substantial right to be tried only on

23

charges presented in an indictment returned by a grand jury." *Stirone v. United States*, 361 U.S. 212, 217 (1960). The Supreme Court has long held that if a defendant "*might* have been . . . convicted on a charge the grand jury never made against" him, such error is "fatal." *Id.* at 219 (emphasis added). "When the trial evidence or the jury charge operates to 'broaden [] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended." *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (quoting *United States v. Miller*, 471 U.S. 130, 138 (1985)); *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997) ("An unconstitutional amendment of the indictment occurs when the charging terms are altered, either literally or constructively. . . . [T]he defendant [must be] given notice of the core criminality to be proven at trial."). "[W]hen only one particular kind of [criminal conduct] is charged . . . a conviction must rest on that charge and not another." *United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir. 1988) (citation omitted); *see also United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) ("In light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts 'vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury.'") (citations omitted).

"To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Milstein*, 401 F.3d at 65 (quotation marks and citation omitted). A "constructive amendment of an indictment is a *per se* violation of the Grand Jury Clause of the Fifth Amendment 'that require[s] reversal even without a showing of prejudice to the defendant." *Wozniak*, 126 F.3d at 109 (citation omitted).

This Court has determined that an "essential element of the charge" has been altered where a defendant may have been convicted based on facts not charged in the indictment. *See, e.g.*, *Milstein*, 401 F.3d at 64-65 (finding constructive amendment where the indictment charged the defendant with misbranding pharmaceuticals because he "re-packaged drugs as if they were the original product from the licensed manufacturers" but the government presented evidence that the drugs were misbranded because they were labeled as sterile when they were not, and the district court permitted conviction on this theory); *Wozniak*, 126 F.3d at 109-11 (holding that an indictment charging conspiracy to possess with intent to distribute cocaine and methamphetamine was constructively amended where the government's evidence focused on marijuana and the district court charged the jury that it "could convict regardless of which illegal substance was involved"); *United*

*States v. Roshko*, 969 F.2d 1, 5-6 (2d Cir. 1992) (finding constructive amendment where the indictment alleged one sham marriage but the government introduced evidence related to two marriages and the district court permitted conviction on that basis); *United States v. Hassan*, 578 F.3d 108, 114, 133-34 (2d Cir. 2008) (finding constructive amendment where "the government made the deliberate choice to indict [the defendant] with conspiring to import and possess" a specific, Schedule I controlled substance, but the "jury charge . . . allowed the jury to convict if Hassan conspired to import or distribute 'some controlled substance.'"). That is precisely what happened here.

### B. The District Court Erroneously Permitted The Government To Argue An Uncharged Theory Of Guilt To The Jury

An "essential element of the charges"—the "core of criminality to be proven at trial" against Dagar—was that on November 4, 2021, Dagar allegedly acquired material nonpublic information concerning the positive results of the Paxlovid clinical trial that would be disclosed in a press release the following day. But the jury was erroneously permitted to convict him (over his objections) of insider trading and conspiracy charges based on evidence other than proof that Dagar actually knew the results of the Paxlovid trial.

Every single allegation in the superseding indictment relating to material nonpublic information concerns information about the positive results of the Paxlovid trial that Dagar allegedly learned on November 4, 2021. *See supra* pp. 4-

26

6; A-35-40. The government's opening statement confirmed that its theory of this case hinged on Dagar's knowledge of this material nonpublic information. *E.g.*, A-59 ("But on November 4, 2021, he learned confidential information about the drug trial, and then he used that information to illegally trade in Pfizer securities."); A-60-61 (describing communications on November 4, 2021 and stating "[a]t that point, the defendant had confidential, nonpublic information that would have been extremely meaningful to any regular investor"); *see supra* pp. 6-8. And even in the beginning of its summation, the government asserted that the relevant material nonpublic information was the information about the results that Dagar allegedly learned on November 4, 2021. *E.g.*, A-180-81 ("On November 4, 2021, he knew very valuable inside information . . . . On that day, he knew that Pfizer had gotten the outcome of the Paxlovid interim analysis. . . . He knew that Pfizer was going to issue a press release the next day about the results."); A-182 ("He bought those Pfizer options on November 4 *because that's when he received very valuable inside information* about what was going to happen the next day.") (emphasis added).

But then the government pivoted, presenting a brand new theory of liability concerning "valuable inside information" possessed by Dagar completely untethered from any allegations in the superseding indictment. *See supra* pp. 14-16; A-183-87; A-191-92. The government explicitly argued that Dagar "knew this inside information before Oberoi messaged him about the outcome on November

27

4." A-191. This evidence included Dagar's alleged knowledge of the Paxlovid clinical trial more generally: (1) knowledge of a Paxlovid "statistical analysis plan" sent to Dagar on October 26, 2021, more than a week before Dagar allegedly acquired material nonpublic information about the results, *see* A-184; A-294; (2) knowledge of the positive outcome of a "sentinel cohort safety review" of Paxlovid in August 2021, A-184-85; (3) knowledge that Paxlovid had cleared a "proof-of-concept assessment," A-185; (4) knowledge that "the study was designed to conduct an interim analysis," *id.*; and (5) knowledge that "there were four possible outcomes of the Paxlovid interim analysis," A-187. This information was generally made available to Pfizer employees on the Paxlovid trial team. *See* A-77-78; A-81; A-83-85; A-89.

The government "broaden[ed] the possible bases for conviction" when it argued to the jury that they could convict on this new theory alone. *See Milstein*, 401 F.3d at 65. The government repeatedly argued that "[e]ven if the defendant did not know for certain that the results were overwhelming efficacy, he is still guilty of insider trading." A-193-94; *see also supra* p. 16. In its rebuttal summation, the government explicitly argued that material nonpublic information alleged nowhere in the superseding indictment could form the basis of conviction:

> He knew the Paxlovid drug trial had passed a safety milestone. He knew it had passed a milestone about effectiveness. And he knew, on November 4, that a press release would come out the very next day with the results. Just that information, taken together, is material nonpublic

information . . . you can convict based on the material nonpublic information that I have just described.

A-212-13; *see also supra* p. 16.

The government was wrong. The superseding indictment returned by the grand jury was "drawn very specifically to cover only" material nonpublic information Dagar allegedly learned on November 4, 2021 related to the positive results of the Paxlovid study and forthcoming press release. *See Zingaro*, 858 F.2d at 100. By failing to grant Dagar's request to provide a copy of the superseding indictment to the jury and give an instruction describing the nature of the material nonpublic information alleged in the superseding indictment, *see supra* pp. 16-18, the jury was left in the dark as to nature of the crime charged by the grand jury and thus was allowed to convict Dagar on evidence and a theory of guilt not charged in the superseding indictment, *see Zingaro*, 858 F.2d at 99 ("introduction of [uncharged] evidence, without the suggested limiting instruction, clearly provided a broader basis for conviction than . . . charged in the indictment"); *Mollica*, 849 F.2d at 728-30 (finding constructive amendment where the government charged tax-related offenses but the district court's charge to the jury, "when read as a whole," presented "substantial risk that the jury may have believed that it could convict the defendants of a general conspiracy to defraud that did not involve income taxes"). This was a "fatal error" requiring reversal. *Stirone*, 361 U.S. at 219.

29

This Court's decision in *United States v. Zingaro* is instructive. There, the superseding indictment, which charged the defendant with a RICO conspiracy, "detailed Zingaro's alleged involvement in Yonkers 'social clubs'" and the unlawful collection of loans relating to gambling activity at those clubs. *Zingaro*, 858 F.2d at 96. At trial, the government successfully introduced evidence of another allegedly unlawful debt collection from a diner owner ("George the Greek"), unrelated to gambling at the Yonkers social clubs. *See id.* The government "recounted in detail the circumstances of the 'George the Greek' loan" in its summation. *Id.* The defendant argued that the indictment was "narrowly drawn to charge only loansharking and unlawful debt collection" related to the social clubs and requested a limiting instruction related to the "George the Greek" loan, which the district court denied. *Id.* at 96-97.

In reversing Zingaro's conviction, this Court analyzed the specific language and structure of the superseding indictment, including the detailed allegations concerning unlawful debt collection relating to the Yonkers social clubs. The Court concluded that "[t]here is no room in these highly specific allegations for an alternative charge unrelated to the Yonkers gambling business." *Id.* at 100-01. Citing *Stirone v. United States*, the Court observed that an indictment drawn in general terms might permit an alternative theory, but when the indictment elects to

30

charge specific facts supporting the offense, a conviction must rest on those facts. *Id.* at 99 (citing *Stirone*, 361 U.S. at 218).

Here, the superseding indictment was drawn specifically: it only includes allegations related to material nonpublic information Dagar allegedly learned on November 4, 2021 concerning the Paxlovid study results and press release.  But the government's choice to urge conviction on other facts—which had nothing to do with Dagar's knowledge of the results of the Paxlovid trial—impermissibly broadened the bases on which the jury could find Dagar guilty.  Simply put, the superseding indictment gave Dagar "no inkling that he was charged with [insider trading] unrelated" to the alleged material nonpublic information he received on November 4, 2021 concerning the Paxlovid study results and press release.  It was error for the district court, once it was clear that the government was relying on an alternative theory, to fail to reign in the government through a corrective instruction and by providing the superseding indictment to the jury.

The constructive amendment of an indictment is a *per se* violation of the Fifth Amendment requiring reversal even without a showing of prejudice. *Wozniak*, 126 F.3d at 109.  Dagar was nonetheless prejudiced by the district court's decision to overrule his request for corrective jury instructions, which allowed the government to present and argue to the jury an impermissible, uncharged theory of guilt.

The defense's theory of the case was that Dagar did not know the results of the Paxlovid trial on November 4, 2021 when he purchased Pfizer stock options. *See supra* pp. 13-14. The ambiguity of the November 4 Microsoft Teams chat between Oberoi and Dagar, Oberoi's inability to say he intended to convey the result to Dagar, and Dagar's contemporaneous expression of surprise when he saw the news reports following the press release, *see supra* p. 13, presented fertile ground for reasonable doubt. The government's mid-summation pivot to the uncharged theory demonstrates that it was concerned that the defense had gained traction. Without corrective action, the jury was not forced to focus on the key issue in the case: did Dagar know the results or not. By allowing the government to argue during summation—for the first time throughout the entire trial—a theory of the case that was based on uncharged conduct, the district court erroneously deprived Dagar of the opportunity to object to (or seek a limiting instruction for) evidence that was marginally relevant to the charged theory of the case yet was seemingly the government's primary support for its uncharged theory.

As a result of the district court's error, there is no way to tell whether the jury unanimously agreed that Dagar actually knew the results of the Paxlovid study. As that knowledge was an essential component of the crime charged by the grand jury, the verdict must be reversed. *See Milstein*, 401 F.3d 5 at 65; *Roshko*, 969 F.2d at 5-6; *Hassan*, 578 F.3d at 133-34.

## II.    THE GOVERNMENT FAILED TO PROVE VENUE IN THE SDNY

Venue is a protection enshrined in the Constitution which guarantees the right to a jury trial in the "district wherein the crime shall have been committed." U.S. Const. amend. VI; *see also id.* Art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the . . . Crimes shall have been committed."). And pursuant to the venue provision specific to the Securities Exchange Act under which Dagar was charged, venue is proper in any district "wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa(a).

In applying these constitutional and statutory mandates, this Court has determined that, in order to establish venue is proper in the chosen district, the government must prove by a preponderance of the evidence that "(1) the defendant intentionally or knowingly cause[d] an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *Svoboda*, 347 F.3d at 483 (citing *United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001); *United States v. Bezmalinovic*, 962 F. Supp. 435, 438 (S.D.N.Y. 1997)); *see also United States v. Khalupsky*, 5 F.4th 279, 291 (2d Cir. 2021); A-54. This Court has also endorsed a district court's view that "[p]urely ministerial functions that are unintended and unforeseeable to a defendant are insufficient to establish venue." *Svoboda*, 347 F.3d at 483 (citing *Bezmalinovic*,

962 F. Supp. at 441). Based on these principles, the district court in this case instructed the jury as follows:

> The government does not have to prove that a completed crime was committed within the Southern District of New York, or that the defendant was ever in the Southern District of New York. It is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred in this district. Venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue. The act itself need not be a criminal act. It could include, for example, processing or executing a securities trade within this district. It could also include trading securities on an exchange located in this district. And the act need not have been taken by the defendant, so long as the act was part of the crime that you find the defendant committed. Purely ministerial functions and preparatory acts that are unintended and unforeseeable by the defendant are insufficient to prove venue.

A-224-25; A-54.

The evidence was clear that Dagar and Bhiwapurkar placed their trades from outside the SDNY, and the processing and execution of their trades took place in New Jersey. Because the government could not establish any connection between Dagar and Bhiwapurkar's trades and the SDNY, it instead sought to establish venue through evidence that Nasdaq, certain sellers of Pfizer options, and firms engaging in clearing and settlement services for those sellers maintain *corporate headquarters* in the SDNY. This evidence is insufficient as a matter of law to establish that an act in furtherance of the charged offenses occurred in the SDNY. The government also failed to establish Dagar's *mens rea* as to venue. There was

34

simply no evidence from which it could be inferred that Dagar knew or intended any act to occur in the SDNY. And the evidence presented regarding Dagar's experience in trading cannot establish that he could have foreseen that an act related to his or Bhiwapurkar's trades would occur in the SDNY.

The government failed to prove venue by a preponderance of the evidence. As a result, the Court should vacate Dagar's conviction and order a new trial in a district where venue is proper. *See Smith v. United States*, 599 U.S. 236, 243 (2023).

### A. There Was No Evidence Of An Act In Furtherance Of The Charged Offenses Occurring In The SDNY

The government failed to present evidence that an act in furtherance of the charged offenses occurred in the SDNY. The evidence showed that Dagar lived in New Jersey, worked for Pfizer from his home in New Jersey, and placed his trades while at home in New Jersey. A-128; A-130-31. Dagar purchased the Pfizer stock options on November 4, 2021 in his Fidelity account, A-263, which had a Rhode Island address, A-263; A-271. Evidence also showed that Bhiwapurkar resided in California, A-162, and the record was silent on where Bhiwapurkar was on the days he traded.

Forced to find some potential connection between Dagar and Bhiwapurkar's trades and the SDNY, the government argued that venue was established by the location of the corporate headquarters of the exchange to which some of Dagar and

35

Bhiwapurkar's trades were routed, the corporate headquarters of certain sellers of Pfizer options matched with Dagar and Bhiwapurkar's trades by an exchange, and the corporate headquarters and servers of certain ministerial service providers who cleared and settled the seller's trades. Each of these circumstances is insufficient as a matter of law to establish that an act actually took place in the SDNY.

### 1. Nasdaq's Corporate Headquarters Do Not Establish an Act in Furtherance of the Charged Offenses in the SDNY

The government principally argued that venue was established by evidence that Nasdaq—one of the exchanges to which certain of Dagar and Bhiwapurkar's trades were routed by their brokerage firms—maintains a corporate headquarters in the SDNY. A-195; *see also* A-356-57; A-284; A-149-50. This evidence is insufficient as a matter of law to establish venue because the corporate headquarters of the entity operating an exchange is not where *the exchange* itself is located. Rather, an exchange is located where the trades actually take place, that is, where the trades are matched. For a remote, electronic exchange like Nasdaq, that is the location of the servers hosting its trading engines. In this case, Nasdaq's servers were in New Jersey. A-149-50; A-157-60; A-163-64.

Traditionally, an exchange is located "where matching takes place," i.e., the location where the buyer and seller meet and reach agreement as to the trade. *Williams v. Binance*, 96 F.4th 129, 139 (2d Cir. 2024). As this Court has explained, "prior to the advent of remote algorithmic high-speed trading" like on Nasdaq,

"buyers and sellers of commodities futures would reach an agreement on the floor of the exchange and then subsequently submit their trade to a clearinghouse for clearing and settling." *Id.* at 137 (quoting *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 68 (2d Cir. 2018)). This "meeting of the minds" between the buyer and seller occurred on the physical exchange floor where the trades were matched. *Id.* at 137-39. With the introduction of electronic exchanges like Nasdaq, trades are now matched by the trading engines hosted on the exchange's servers. *Id.* at 138. Thus, the location of an electronic exchange is the location of the servers hosting its trading engines. *See id.*

Here, it is undisputed that Nasdaq is an electronic exchange which matches the trades of its buyers and sellers on matching engines and servers in New Jersey—not in the SDNY. *See* A-149-50 (government expert testifying that the Nasdaq exchange engines where buyers and sellers are "match[ed]" are located in New Jersey); A-159-60 (government expert testifying that trades on the Nasdaq exchange are "executed" and "consummated" in New Jersey); A-163-64 (government witness testifying that the Nasdaq exchange is located in New Jersey and that the execution of trades placed on Nasdaq takes place in New Jersey). And while Nasdaq maintains its corporate headquarters in Manhattan, there is no evidence that any act in furtherance of the charged offenses—or anything related to such an act—occurred at or in those corporate headquarters.

This Court has held that venue in insider trading cases is proper in a district where an exchange *executes* the relevant trades, not the district where the exchange merely maintains a corporate headquarters and no other act occurs. In *United States v. Svoboda*, this Court concluded that venue was proper in the SDNY because the trades at issue "were *executed* on the New York Stock Exchange ('NYSE') or American Stock Exchange ('AMEX'), both of which are located in the Southern District of New York." 347 F.3d at 482. The Court repeatedly emphasized the significance of the location of the *execution* of the trades: "there is nothing in the record to indicate that [the defendant] intended the trades in question to be *executed* on either NYSE or AMEX"; the defendant "could reasonably foresee that his trades would likely be *executed* on either NYSE or AMEX"; "More importantly, however, [the defendant] had actual notice that his trades were being *executed* on NYSE and AMEX"; "individual trade confirmations . . . reflect[ed] that eight of the transactions in question were *executed* on NYSE or AMEX"; the defendant "knew, or could reasonably foresee, that his trades would be *executed* in the Southern District of New York"; the defendant "ordered trades knowing that they would be *executed* in the Southern District." *Id.* at 483-84 (emphases added). In fact, the *Svoboda* Court noted that its finding of venue was consistent with district court decisions within the Second Circuit which had "upheld venue where the only relevant contact to the venue was that various trades were *executed* in the

38

district." *Id.* at 484 n.13 (citing *SEC v. Thrasher*, No. 92-Civ-6987, 1993 WL 37044, at *2 (S.D.N.Y. Feb. 8, 1993) ("The location of a trade's execution provides a basis for venue."); *Grossman v. Young*, 70 F. Supp. 970, 972 (S.D.N.Y. 1947) ("It is not disputed that the transactions were executed in the New York Stock Exchange in the Southern District of New York.")).

Similarly, in *United States v. Geibel*, this Court found that venue was improper over trades that did not "utilize[] the *facilities* of any New York-based securities exchange or brokerage firm" but proper over trades that were "executed" on an exchange both "located and headquartered in New York." 369 F.3d 682, 697-98 (2d Cir. 2004) (emphasis added). The Court's acknowledgment that the relevant exchange was both "located" *and* "headquartered" in the SDNY establishes that the location of an exchange's headquarters is not alone sufficient to establish venue. And, in *United States v. Riley*, this Court held that venue was proper, 638 F. App'x 56, 62 (2d Cir. 2016) (summary order), based on evidence of the "execution, settlement, and clearing of trades over servers located in the Southern District of New York," Br. for the United States, at 55, *United States v. Riley*, No. 15-1541, 2015 WL 6522453 (2d Cir. Oct. 26, 2015).

Most recently, in *United States v. Chow*, this Court found that venue was proper in the SDNY where there was evidence that the defendant's purchases of securities were "*executed*, cleared, and recorded" in the SDNY. 993 F.3d 125, 143

(2d Cir. 2021) (emphasis added). While the Court generally stated that "[w]here the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is appropriate," that was in direct reliance on *Svoboda*, *Giebel*, and *Riley*—each of which found venue proper based on the location where the exchange *executed* the relevant trades, not merely the corporate headquarters of the exchange. *Id.* at 143 (citing *Svoboda*, 347 F.3d at 483; *Giebel*, 369 F.3d at 697-98; *Riley*, 638 F. App'x at 62). And, while the Court stated that "the Southern District of New York is the district in which the NASDAQ is located," that conclusion was based on the very limited evidence of venue presented at trial: Nasdaq was headquartered in Manhattan and the trades at issue were completed through firms in Manhattan. *Id.* Significantly, the Court noted in *Chow* that "no witness was able to say with certainty whether [Nasdaq's] servers that execute trades were located in New York or New Jersey," *id.* at 133, and, as there was no evidence of the location of Nasdaq's servers, the *Chow* Court concluded that it was reasonable for the jury to infer that the servers were in Manhattan based on the presented evidence, *id.* at 143.

To the contrary, here, the evidence clearly showed that Nasdaq's servers hosting its trading engines—the place where trades on Nasdaq are executed and matched—were located in New Jersey. A-149-50; A-159-60; A-163-64. The only reasonable conclusion is that the Nasdaq exchange was "located in" New Jersey—

not the SDNY.  Evidence that Nasdaq maintained a corporate headquarters in the SDNY is insufficient to establish venue there.

**2. The Corporate Headquarters of the Sellers and Their Clearing Firms Do Not Establish An Act in Furtherance of the Charged Offenses in the SDNY**

An act in furtherance of the charged offenses occurring in the SDNY cannot be established through evidence (i) that one of the sellers of Pfizer options matched by the exchanges with Dagar's trades had corporate headquarters in the SDNY; or (ii) that certain of the firms providing clearing and settlement services to the sellers involved in Dagar and Bhiwapurkar's trades had corporate headquarters or a server in SDNY.

First, evidence that one of the ten sellers of Pfizer options matched by an exchange with Dagar's trades, HRT Financial, maintained a corporate headquarters in the SDNY, A-284; A-147, does not establish any act in furtherance of the charged offenses.  The record was silent as to who at HRT Financial placed the trade and where the trade was placed from.  And while HRT Financial may have maintained a corporate headquarters in the SDNY, sophisticated market participants, such as HRT Financial, also maintain servers in New Jersey to increase execution speed with the exchange's servers.  A-157-58.

Second, evidence related to the firms which provided clearing and settlement services to the sellers is also insufficient to establish an act in furtherance of the

charged offenses in the SDNY because clearing and settlement services are purely ministerial functions. A-145 ("Q. And everything that Goldman Sachs does is basically recordkeeping that follows the execution of the trade, correct? A. Correct. Q. Would you agree that those are ministerial functions? A. Yes."); *see also* A-146. While such services may be "necessary parts" of an options trade, A-141, they are nonetheless ministerial and only provided after the trade has been matched, executed, and consummated, A-143; A-159-160.

As this Court has acknowledged and the district court instructed the jury, "[p]urely ministerial functions and preparatory acts that are unintended and unforeseeable by the defendant are insufficient to prove venue." A-225; *Svoboda*, 347 F.3d at 483 (referencing *Bezmalinovic* with approval); *see Bezmalinovic*, 962 F. Supp. at 441. The clearing and settlement services are back-office "recordkeeping" and "ministerial functions." A-141; A-145-46; A-160. The record was silent as to where the clearing and settlement services took place for Dagar and Bhiwapurkar's side of the trades. Indeed, Dagar's brokerage firm (Fidelity) would have used its own clearing service provider. A-146.

The government's evidence concerning the headquarters of a seller and the location of clearing firms failed to show by a preponderance of the evidence that an act in furtherance of the charged offenses occurred in the SDNY.

42

**B.      There Was Insufficient Evidence Of Dagar's State Of Mind As To Venue**

Even if the government had presented sufficient evidence to establish that an act in furtherance of the charged offenses occurred in the SDNY, venue is improper in the SDNY because there was no evidence that (i) Dagar knowingly or intentionally caused that act to occur in the SDNY or (ii) that it was foreseeable to Dagar that the act would occur in the SDNY. *Svoboda*, 347 F.3d at 483.

**1.   Knowingly or Intentionally**

There was no evidence that Dagar knowingly or intentionally caused an act in furtherance of the charged offenses to occur in the SDNY.  There was no evidence that Dagar knew or intended that his or Bhiwapurkar's trades would be routed to the Nasdaq exchange as opposed to any other securities exchange located elsewhere in the country.  *See* A-284 (listing national securities exchanges including those based outside of the SDNY).  For example, there were no trade confirmations or other correspondence from Fidelity (Dagar's brokerage firm) received by Dagar from which it could be inferred that he knew the trades were routed through Nasdaq.  Even if there was evidence that Dagar knew that the trades were on Nasdaq (there was not), there was also no evidence that Dagar knew where Nasdaq maintained its headquarters, trading engine, or servers.  The only evidence at trial regarding Dagar's state of mind as to the location of his and Bhiwapurkar's trades was that he placed his trades while at home in New Jersey,

43

A-128; A-130-31, through his Fidelity account with a Rhode Island address, A-263; A-271, and that Bhiwapurkar lived in California, A-162.

There was also no evidence that Dagar knew any information about or intended that his trades be matched with sellers of Pfizer stock options who had corporate headquarters in the SDNY. There was no evidence that Dagar knew who the sellers were, where those sellers had headquarters or hosted servers, which clearing and settlement firms those sellers used, where those firms were headquartered or maintained servers, or how functions of a clearing and settlement firm operate. There was simply no evidence from which a rational jury could infer that Dagar knowingly or intentionally caused his or Bhiwapurkar's trades to be matched with sellers or cleared and settled by firms with headquarters or servers in the SDNY.

Evidence that Dagar generally intended to trade Pfizer stock options is not sufficient to establish venue in the SDNY. In order to establish that a defendant knowingly or intentionally caused an act to occur in a district, the government must prove more than the defendant's general criminal *mens rea* to commit the charged offense. *United States v. Parrilla*, No. 13-CR-360, 2014 WL 7496319, at *12-13 (S.D.N.Y. Dec. 23, 2014) (explaining that a phone call or a text message into the district could be sufficient to satisfy venue "so long as the call or text message was in furtherance of the [charged offense] *and the defendant knew . . .*

*that the call or text came from or went to [district]*" (emphasis added)), *aff'd sub nom. United States v. Tang Yuk*, 885 F.3d 57 (2d Cir. 2018). A defendant's knowledge of the fact of an act in furtherance of the offense happening (i.e., the call or the trade) is not sufficient for venue; there must be evidence that the defendant knew that the act was connected with the district in some way. This comports with the Second Circuit's instruction that there must be some "'sense of [venue] having been freely chosen by [the defendant].'" *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985).

### 2. Foreseeability

The government also failed to prove that Dagar could have foreseen that an act in furtherance of the charged offenses occurred in the SDNY. The origin of the foreseeability prong of the venue rule set forth in *United States v. Svoboda* originates in the constitutional protections of the Sixth Amendment. In *United States v. Reed*, this Court explained that, while "there is no single defined policy or mechanical test to determine constitutional venue . . . the test is best described as a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." 773 F.2d at 481. In *United States v. Bezmalinovic*, a district court case subsequently

relied upon by this Court in *Svoboda*, the district court applied *Reed*'s substantial contacts test and, in reviewing Second Circuit cases, stated that:

> [T]he Second Circuit considered foreseeability and intent of the defendants to be important factors in the determination of whether venue was constitutionally permissible. Indeed, the Second Circuit stated that it would be "loath to uphold venue" solely on the basis of an insignificant contact with this district that was not intended by the defendants or foreseeable to them.

*Bezmalinovic*, 962 F. Supp. 435, 441 (S.D.N.Y. 1997) (quoting *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987)). Based on this analysis, the district court concluded that venue did not lie in the SDNY where the defendant was charged with bank and mail fraud for "obtaining a mortgage from [a financial institutional, MHT] by means of a false mortgage application" where all of the defendant's acts took place in the Eastern District of New York. *Id.* at 436. The district court rejected the government's argument that venue was proper in the SDNY based on allegations concerning mere ministerial acts and the location of MHT's headquarters in Manhattan. *Id.* The district court concluded that the defendant did not intend and could not have foreseen that those acts would occur in the SDNY, no decisions were made by the target of the fraud in the SDNY, and the only acts that occurred in this district were ministerial. *Id.* at 441.

Relying in part on *Bezmalinovic*, this Court then articulated the established standard for venue in the Second Circuit and, therefore, the standard for venue used in the jury instructions of this case: "venue is proper in a district where (1) the

defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *Svoboda*, 347 F.3d at 483 (citing *Kim*, 246 F.3d at 192 (intentionally or knowingly prong); *Bezmalinovic*, 962 F. Supp. at 441 (foreseeability prong)); A-54. This Court's articulation of this foreseeability prong in the venue standard makes clear that a finding of venue requires more than just a "tenuous" connection to the SDNY, *Bezmalinovic*, 962 F. Supp. at 441, and that, in order to "comport with constitutional safeguards, . . . there must be some 'sense of [venue] having been freely chosen' by the defendant," *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012) (quoting *Reed*, 773 F.2d at 481).

Here, there was insufficient evidence that an act in furtherance of the charged offenses was foreseeable to Dagar. First, there was no evidence from which a jury could infer that it was foreseeable to Dagar that his and Bhiwapurkar's trades would be placed on an options exchange in the SDNY as opposed to an options exchange located anywhere else in the world. In fact, the government's evidence showed that there were at least 35 options exchanges on which Dagar's options could have been purchased, A-284, many of which are not based in the SDNY. Second, there was no evidence from which it could be inferred that Dagar could have foreseen which sellers of Pfizer options would be matched with Dagar and Bhiwapurkar's trades by an exchange. The evidence

47

actually showed that only one seller of Pfizer options into Dagar's trades (HRT Financial) had a headquarters in the SDNY.  A-356-57; A-284.  The other three sellers of Pfizer options into Dagar's trades (Citadel Securities, Susquehanna Securities, and IMC Chicago) and the two sellers of Pfizer options into Bhiwapurkar's trades (Susquehanna Securities and IMC Chicago) all had addresses in either Chicago, Illinois or Bala Cynwyd, Pennsylvania.  A-356-57; A-284. Third, there was no evidence from which it could be inferred that Dagar could have foreseen which firms the sellers matched opposite of his and Bhiwapurkar's trades would use to clear and settle their side of the trade or where they would be headquartered.  The government's evidence showed that there were hundreds of firms—with addresses all over the United States—which could have cleared and settled the sellers' trades.  A-285.

While the Second Circuit has found that foreseeability can be inferred based on a defendant's sophistication, education, or specialized knowledge and experience in business or the financial markets, there was no such evidence in this case.  *See Riley*, 638 F. App'x at 60, 62 (concluding that "a reasonable jury could have found it more likely than not that [the defendant], *as Foundry's CIO [Chief Information Officer]*, could have foreseen that the trading that would result from his communication of inside information . . . would occur in the Southern District of New York, given that Foundry's shares were publicly traded on NASDAQ,

48

located in Manhattan" (emphasis added)); *Khalupsky*, 5 F.4th at 292 (concluding that a jury could infer from evidence of "the defendants' *expertise* as traders," among other things, that "defendants foresaw the existence of counterparties in the EDNY" (emphasis added)); *Chow*, 993 F.3d at 129, 143-44 (concluding that "[t]he jury was entitled to infer that [the defendant] would have been aware that the shares of Lattice were listed and traded on the NASDAQ stock exchange, which was in Manhattan" because the defendant was the managing director of one of the companies seeking to acquire Lattice, led two teams "in the due diligence process required for exploring the possible acquisition of Lattice," and had "college and postgraduate degrees includ[ing] a Master's Degree in business"); *Svoboda*, 347 F.3d at 483 (defendant was a "savvy investor" who received trade confirmations indicating the exchange at which each trade was executed).

Testimony from the government's own witnesses established that Dagar was an unsophisticated retail trader without any training or education in finance or trading, would not have understood the back office aspects of a trade, and placed trades that were generally not well researched or successful. *See* A-161 (re-direct of government expert Peter Melley: "Q. Is it fair to say that you need to be good at trading options to maximize your profits in that way? A. Sure. You need to be experienced, sophisticated, know what you're doing, well researched. Q. You need to be successful at doing it? A. Yes. Q. Did Mr. Dagar have that track record

of success based on the records you reviewed?  A.  Not at all."); A-145-46 (cross

examination of government witness Joseph Pozzi: "Q.  And for a retail trader with

an account[] at a brokerage firm like Fidelity, they really have no idea what goes

on with respect to the clearing and settlement of an options trade, would they?  A.

Fidelity would have their own clearing service provider.  Q.  I am talking about the

actual retail trader.  A.  The trader, probably not.").  Dagar's role at Pfizer as a

statistical programmer established that he was knowledgeable about computer

coding and software programs rather than finance and trading.  A-93.  And Dagar's

social circle was made up of other statistical programmers in the pharmaceutical

industry rather than individuals working or trained in finance.  A-128-29.  While he

may have placed a significant number of trades over a period of years, it does not

follow, without more, that Dagar understood the financial markets, understood on

which specific exchange his trades took place, or knew where any specific

exchange executed its trades or even maintained a headquarters.  Such a conclusion

could only be drawn based on specialized knowledge of a company and its stock,

business, or the financial markets more generally.

An inference of foreseeability based upon purported common knowledge

that New York is the world's leading financial center, as the government was

reduced to arguing in post-trial proceedings, A-237, would be unfounded given the

nature of the securities in this case.  Chicago—not New York—is considered to be

the center of options trading in the United States. *See, e.g.*, *The Cboe wants to 'debunk' some 0DTE myths*, Financial Times (Apr. 15, 2024), https://www.ft.com/content/dc249ab8-6b35-42c0-966e-eebb65dbb174 (describing the Cboe (originally the Chicago Board Options Exchange) as the "dominant US options exchange"). Even if the evidence supported an inference that Dagar was a sophisticated, trained, and educated trader, the proper inference would be that his options trades would go through exchanges in Chicago, not the SDNY. The government failed to prove venue in the SDNY.

## CONCLUSION

For the foregoing reasons, Dagar's convictions should be reversed and the case remanded for a new trial in a district where venue is proper.

Dated:     New York, New York
            November 22, 2024

                                    Respectfully submitted,

                                      */s/ Patrick J. Smith*
                                      Patrick J. Smith
                                      Selbie L. Jason
                                      Michael K. Sala
                                      CLARK SMITH VILLAZOR LLP
                                      666 Third Ave, 21st Floor
                                      New York, New York, 10017
                                      (212) 377-0850

                                      *Attorneys for Defendant-Appellant*
                                      *Amit Dagar*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,351 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.

Dated: November 22, 2024

/s/ *Patrick J. Smith*
Patrick J. Smith

SPECIAL  APPENDIX

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Order Denying A. Dagar Motion for Judgment of
    Acquittal, entered May 23, 2024 .......................... SPA-1

Judgment, entered August 21, 2024.......................... SPA-8

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
                                                       :
UNITED STATES OF AMERICA                               :
                                                       :          23 Cr. 319 (ALC)
                 - v. -                                 :
                                                       :
AMIT DAGAR,                                             :
                                                       :
                          Defendant.                   :
                                                       :
------------------------------------------------------ x

**ANDREW L. CARTER, JR., United States District Judge:**

On January 18, 2024, a jury convicted Defendant Amit Dagar of both counts of the two-

count superseding Indictment: (i) securities fraud, in violation of Title 15, United States Code,

Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Count

One); and (ii) conspiracy to commit securities fraud, in violation of Title 18, United States Code,

Section 371 (Count Two). Defendant seeks a judgment of acquittal on counts one and two of the

superseding Indictment, arguing that there was insufficient evidence presented at trial to support

the jury's verdict and that the Government failed to prove venue by a preponderance of the

evidence. *See* Def. Mem. at 3-4. For the reasons that follow, Defendant's motion is **DENIED**.

## STANDARD OF REVIEW

Under Rule 29, "the Court is authorized to grant a motion for judgment of acquittal only

upon a showing that 'the evidence is insufficient to sustain a conviction.'" *United States v. Hsu*,

643 F. Supp. 2d 574, 575 (S.D.N.Y. 2009) (quoting Fed. R. Crim. P. 29(a)). In applying this

standard, the Second Circuit directs trial courts to " 'determine whether upon the evidence, giving

full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable

inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable

1

doubt.'" *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)); *accord United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) ("'[A] judgment of acquittal' is warranted 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" (citation omitted)).

In evaluating a Rule 29 motion, the Court "view[s] the evidence presented in the light most favorable to the government, and . . . draw[s] all reasonable inferences in its favor." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). "Furthermore, [the Court] considers] the evidence in its totality, not in isolation, and the government need not negate every theory of innocence." *Id.*

It is well-settled that a defendant who challenges the sufficiency of the evidence under Rule 29 "bears a heavy burden." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). District courts are repeatedly cautioned "to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). The Court is "mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court." *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006).

## DISCUSSION

**I.    The Evidence Presented at Trial was Sufficient to Sustain Dagar's Conviction on Count One for Securities Fraud**

Defendant argues that no rational trier of fact could have found Dagar guilty of Count One, which charged the Defendant with committing insider trading by trading in Pfizer stock options on the basis of material nonpublic information he learned as part of his employment

SPA-3

with Pfizer and in violation of his duties of trust and confidence to Pfizer. The Court

instructed the jury as follows regarding the securities fraud charge:

> In order to find that the defendant is guilty of [the] crime charged in Count One, you must find that the government has proven beyond a reasonable doubt each of the following elements: First, that in connection with the purchase or sale of a security, the defendant employed a device, scheme, or artifice to defraud, or engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller of the specified security; Second, that when he engaged in the scheme, the defendant acted knowingly, willfully, and with an intent to defraud; and Third, that in furtherance of the scheme, there occurred at least one use of any means or instrument of transportation or communication in interstate commerce, or the use of the mails, or the use of any facility of any national securities exchange.

Tr. 948:21-949:12; *see also* Jury Instructions at 10 (ECF No. 90). At trial, the Government

produced overwhelming evidence to support the jury's guilty verdict on Count 1, namely that

Dagar was working on the Paxlovid drug trial (Tr. 232:6-23); that on November 4, 2021, his

supervisor learned information about the results of the drug trial and that a press release would

be issued the following day (Tr. 253:1-9, GX 202); that the supervisor conveyed to Dagar that

Pfizer had gotten "the outcome," that significant work would be required; and that a press release

would come the following day (Tr. 260:11-262:6, 263:16-264:5, GX 203); that on November 4,

2021, Dagar purchased short-dated Pfizer call options, expiring the following day, one week

later, and two weeks later, giving Dagar the ability to purchase 66,500 shares of Pfizer stock (GX

401); that on November 5. 2021, Pfizer issued a press release that publicly announced the results

of the Paxlovid study and the drug's 89 percent efficacy in reducing the risk of hospitalization or

death in certain COVID-19 cases (GX 401); and that Dagar sold these call options for significant

profits of approximately $272,861 (Superseding Indictment, ECF No. 46 ¶ 6).

   In addition, Dagar's supervisor and close friend, Kawleen Oberoi, testified that he

communicated with Dagar after they were both interviewed by the FBI, and that Dagar asked

him if he had done any trading of Pfizer securities back in November. Tr. 271:9-16. Dagar told

Oberoi that "he [didn't] know what got into his mind. It was really at the spur of the moment, not sure what he was thinking, but he did place a trade on that date." Oberoi also testified that Dagar "sounded very, very low" and "very apologetic, regretful, even though he is a very cheerful individual." Tr. 271:16-272:2. When drawing all reasonable inferences in favor of the Government, the evidence to support Dagar's guilt as to Count One is beyond sufficient to withstand a Rule 29 motion.

## II.    The Evidence Presented at Trial was Sufficient to Sustain Dagar's Conviction on Count Two for Conspiracy to Commit Securities Fraud

Defendant's argument—that no rational trier of fact could have found Dagar guilty of conspiracy to commit securities fraud—is also without merit. Count Two charged the Defendant with conspiracy to commit insider trading, specifically that in or about November 2021, the Defendant conspired with Atul Bhiwapurkar to commit insider trading through trading in Pfizer stock options. The Court instructed the jury as follows regarding the conspiracy charge:

> To sustain its burden of proof with respect to the charge of conspiracy, the government must establish beyond a reasonable doubt the following three elements: First, the existence of the conspiracy charged in the indictment; in other words, that there was, in fact, an agreement or understanding to commit at least one of the object crimes charged in the indictment; Second, that the defendant intentionally joined and participated in the conspiracy during the applicable time period; and Third, that any one of the conspirators—not necessarily the defendant, but any one of the parties involved in the conspiracy—knowingly committed at least one overt act in the furtherance of the conspiracy.

Tr. 958:1-14; *see also* Jury Instructions at 18 (ECF No. 90). The Government presented sufficient evidence at trial to demonstrate that Dagar conspired to commit insider trading when he tipped off his close friend, Bhiwapurkar, who purchased 200 short-dated Pfizer call options on the very same day, and just over two hours after Dagar did. The Government also presented evidence that Dagar and Bhiwapurkar then deleted WhatsApp text messages between them on

every single day Bhiwapurkar sold his options. GX 306; GX 307. Finally, Bhiwapurkar sold his

options for a significant profit. All of this evidence combined strongly supports the jury's guilty

verdict as to Count Two.

### III.    The Government Sufficiently Proved Venue

Defendant, to no avail, makes a last-ditch effort to challenge the jury's finding of venue by a

preponderance of the evidence. The Court instructed the jury as follows regarding venue:

> The Government does not have to prove that a completed crime was committed within
> the Southern District of New York, or that the defendant was ever in the Southern District
> of New York.  It is sufficient to satisfy the venue requirement if any act in furtherance of
> the crime charged occurred in this District.  Venue is proper in a district where (1) the
> defendant intentionally or knowingly causes an act in furtherance of the charged offense
> to occur in the district of venue or (2) it is foreseeable that such an act would occur in the
> district of venue.  The act itself need not be a criminal act. It could include, for example,
> processing or executing a securities trade within this District.  It could also include
> trading securities on an exchange located in this District.  And the act need not have been
> taken by the defendant, so long as the act was part of the crime that you find the
> defendant committed.  Purely ministerial functions and preparatory acts that are
> unintended and unforeseeable by the defendant are insufficient to prove venue.
>
> Unlike the elements of the offenses which must be proven beyond a reasonable doubt, the
> Government is required to prove venue only by a preponderance of the evidence. A
> preponderance of the evidence means that it is more probable than not that some act in
> furtherance of the crime you are considering occurred in this District.

Tr. 965:8-966:9; *see also* Jury Instructions at 26 (ECF No. 90). In *United States v. Chow*, 993

F.3d 125 (2d Cir. 2021), the Second Circuit held that "[w]here the defendant is charged with an

offense involving the trading of securities on a stock exchange located in the SDNY, venue in

that district is appropriate." *Id.* at 143. Just as Chow's challenge to venue in the Southern District

of New York was foreclosed by the established law of this Circuit, so is Dagar's. *United States v.

Chow*, 993 F.3d 125, 144 (2d Cir. 2021) (collecting cases). *See, e.g., Svoboda*, 347 F.3d at 483

(holding venue in the SDNY proper although the defendant's only contacts with the district were

trades executed on New York-based securities exchanges, because the "savvy investor" could

SPA-6

reasonably foresee that trades likely would be executed on such exchange); *United States v. Geibel*, 369 F.3d 682, 697-98 (2d Cir. 2004) (rejecting challenge to SDNY venue on counts involving purchases of options executed on the American Stock Exchange located and headquartered in the SDNY); *Riley*, 638 F. App'x at 62 (holding venue in the SDNY proper because the defendant "could have foreseen that the trading that would result from his communication of inside information to [his tippee] would occur in the Southern District of New York, given that [his company's] shares were publicly traded on NASDAQ, located in Manhattan").

   At trial, the Government produced evidence that the Defendant traded options on a securities exchange located in Manhattan, that one of the entities that sold Pfizer options to the Defendant is located in Manhattan, that two of the firms that cleared the trades of the Defendant and his co-conspirator are located in Manhattan, and that trades made by both the defendant and his co-conspirator were cleared and settled through servers located in the Southern District of New York. *See* GX 113; GX 114; GX 115; GX 116; GX 117; GX 119; GX 402. And despite Defendant's arguments to the contrary, it was reasonably foreseeable that when Dagar traded his options contracts in connection with the stock of a New York-based company that trades on the New York Stock Exchange, such acts would occur in the Southern District of New York. The Government presented evidence that Dagar was not an inexperienced or unsophisticated trader, as he engaged in thousands of options transactions over a period of years. Tr. 478:22-479:6.

   Accordingly, the Government sufficiently proved venue by a preponderance of the evidence.

SPA-7

**CONCLUSION**

For the reasons set forth above, the Defendant's Rule 29 motion for a judgment of

acquittal is **DENIED**. The Clerk of the Court is directed to close the open motion at ECF No.

106.

**SO ORDERED.**

**Dated:**   **May 23, 2024**
        **New York, New York**

_____

**ANDREW L. CARTER, JR.**
**United States District Judge**

7

Case 1:23-cr-00319-ALC    Document 137    Filed 08/21/24    Page 1 of 8    ORIGINAL

AO 245B (Rev. 09/19)    Judgment in a Criminal Case    (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) |
| AMIT DAGAR | ) |

**JUDGMENT IN A CRIMINAL CASE**

Case Number:  23CR319-001 (ALC)

USM Number:  66359-510

Patrick J. Smith
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)    Count 1, 2 of the Superseding Indictment
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 USC 78j(b), 15 USC | Securities Fraud | 6/29/2023 | 001 |
| 78ff and 17 CFR | | | |
| 240.10b-5 | | | |

    The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)    in the underlying Indictment    ☐ is    ☑ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/6/2024

Date of Imposition of Judgment

Signature of Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _8-21-24_

Andrew L. Carter, Jr.,  U.S. District Judge
Name and Title of Judge

8/20/2024

Date

SPA-9

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 1A

Judgment—Page __2__ of __8__

DEFENDANT:  AMIT DAGAR
CASE NUMBER:  23CR319-001 (ALC)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 371 | Conspiracy to Commit Securities Fraud | 6/29/2023 | 002 |

SPA-10

AO 245B (Rev. 09/19)  Judgment in Criminal Case
      Sheet 2 — Imprisonment

DEFENDANT:   AMIT DAGAR

Judgment — Page ___3___ of ___8___

CASE NUMBER:   23CR319-001 (ALC)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of:
9 Months (Nine) on Counts 1 and 2 to run concurrently

☑  The court makes the following recommendations to the Bureau of Prisons:
    If consistent with the Bureau of Prisons, policies, practices and guidelines, the Court recommends designation to
    FCI-Fort Dix in Fort Dix, NJ.

☐  The defendant is remanded to the custody of the United States Marshal.

☑  The defendant shall surrender to the United States Marshal for this district:

    ☑  at ___10:00___  ☑  a.m.  ☐  p.m.  on ___11/6/2024___.

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-11

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page    4    of    8

DEFENDANT:  AMIT DAGAR
CASE NUMBER:  23CR319-001 (ALC)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

 3 Years (three) on Counts 1 and 2 to run concurrently

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ___5___ of ___8___

DEFENDANT:  AMIT DAGAR
CASE NUMBER:  23CR319-001 (ALC)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____    Date  _____

SPA-13

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page  6  of  8

DEFENDANT:  AMIT DAGAR
CASE NUMBER:  23CR319-001 (ALC)

## SPECIAL CONDITIONS OF SUPERVISION

The Defendant shall participate in an outpatient treatment program that provides gambling addiction treatment approved by the U.S. Probation Office.  The Defendant shall contribute to the cost of services rendered based on his ability to pay and the availability of third-party payments.

The Defendant shall be supervised by the district of  residence.

SPA-14

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

|  | Judgment — Page | 7 | of | 8 |

DEFENDANT: AMIT DAGAR
CASE NUMBER: 23CR319-001 (ALC)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ | $ |

☐   The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ | 0.00 | $ | 0.00 |

☐   Restitution amount ordered pursuant to plea agreement $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

     ☐   the interest requirement is waived for the   ☐   fine   ☐   restitution.

     ☐   the interest requirement for the   ☐   fine   ☐   restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-15

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT:  AMIT DAGAR
CASE NUMBER:  23CR319-001 (ALC)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __200.00__  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
proceeds traceable to the commission of said offenses, including but not limited to $272,861.99 in United States currency representing the amount of proceeds traceable to the commission of said offenses.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.