# 24-2239

*To Be Argued By*:
JUSTIN V. RODRIGUEZ

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-2239

———◆◆◆———

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

AMIT DAGAR, also known as Sealed Defendant 1,

*Defendant-Appellant*,

ATUL BHIWAPURKAR, also known as Sealed Defendant 2,

*Defendant*.

———————

On Appeal from the United States District Court
for the Southern District of New York

# BRIEF FOR THE UNITED STATES OF AMERICA

MATTHEW PODOLSKY,
*Acting United States Attorney for
the Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

JUSTIN V. RODRIGUEZ,
JAMES LIGTENBERG,
*Assistant United States Attorneys,
Of Counsel.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.   The Government's Case . . . . . . . . . . . . . . .  4

        1.   Pfizer Trains Dagar on Its Policies
             Prohibiting Insider Trading . . . . . . . . .  4

        2.   Pfizer Conducts a Clinical Trial of
             Paxlovid on High-Risk Patients . . . . . .  5

        3.   Dagar Learns Material Non-Public
             Information about the Study's Results,
             Including When the Results Will Be
             Announced . . . . . . . . . . . . . . . . . . . . . . .  9

        4.   Dagar and Bhiwparkur Buy Pfizer Call
             Options Based on Material Non-Public
             Information . . . . . . . . . . . . . . . . . . . . . .  11

        5.   Pfizer Announces the Results of the
             EPIC-HR Interim Analysis, Its Stock
             Price Jumps, and Dagar and Bhiwparkur
             Sell Their Pfizer Call Options for a Big
             Profit . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        6.   Dagar Admits His Trading to
             Oberoi . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    B.   The Defense Case and Verdict . . . . . . . . . .  15

    C.   Dagar's Post-Trial Motions . . . . . . . . . . . .  16

    D.   Dagar's Sentencing . . . . . . . . . . . . . . . . . . .  16

ii

PAGE

ARGUMENT:

POINT I—There Was No Constructive Amendment of
the Superseding Indictment . . . . . . . . . . . . . . . 16

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 17

        1.   The Superseding Indictment. . . . . . . . 17

        2.   Dagar's Constructive Amendment Motion
*in Limine* . . . . . . . . . . . . . . . . . . . . . . . 20

        3.   The Summations and Dagar's Renewed
Constructive Amendment Motion. . . . 21

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . 28

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 29

POINT II—The Jury and District Court Correctly
Rejected Dagar's Venue Arguments. . . . . . . . . 35

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 36

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . 41

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 44

        1.   There was Sufficient Evidence that an
Act in Furtherance of the Charged
Crimes Occurred in the SDNY . . . . . . 44

        2.   There was Sufficient Evidence of Dagar's
State of Mind as to Venue . . . . . . . . . . 50

iii

PAGE

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## TABLE OF AUTHORITIES

*Cases*:

*Smith v. United States,*
    599 U.S. 236 (2023). . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Allah,*
    130 F.3d 33 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . 43

*United States v. Chow,*
    993 F.3d 125 (2d Cir. 2021) . . . . . . . . . . . . . *passim*

*United States v. D'Amelio,*
    683 F.3d 412 (2d Cir. 2012) . . . . . . . . . . 28, 29, 32

*United States v. Daugerdas,*
    837 F.3d 212 (2d Cir. 2016) . . . . . . . . . . . . . . 29, 32

*United States v. Davis,*
    689 F.3d 179 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 43

*United States v. Dove,*
    884 F.3d 138 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 28

*United States v. Geibel,*
    369 F.3d 682 (2d Cir. 2004) . . . . . . . 42, 43, 44, 47

*United States v. Harvey,*
    746 F.3d 87 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . 43

*United States v. Heimann,*
    705 F.2d 662 (2d Cir. 1983) . . . . . . . . . . . . . . . . . 29

*United States v. Khalupsky,*
    5 F.4th 279 (2d Cir. 2021) . . . . . . . . . . . 28, 33, 54

iv

PAGE

*United States v. Lange*,
834 F.3d 58 (2d Cir. 2016) . . . . . . . . . . . . . . 43, 47

*United States v. Miller*,
808 F.3d 607 (2d Cir. 2015) . . . . . . . . . . . . . . . . 41

*United States v. Naranjo*,
14 F.3d 145 (2d Cir. 1994) . . . . . . . . . . . . . . 41, 52

*United States v. Parrilla*,
No. 13-CR-360, 2014 WL 7496319 (S.D.N.Y. Dec.
23, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

*United States v. Peguero*,
34 F.4th 143 (2d Cir. 2022) . . . . . . . . . . . . . . . . 46

*United States v. Riley*,
13 Cr. 339 (RPP), 2014 WL 53440 (S.D.N.Y. Jan.
7, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Riley*,
638 F. App'x 56 (2d Cir. 2016) . . . . . . . . . . . 42, 45

*United States v. Royer*,
549 F.3d 886 (2d Cir. 2008) . . . . . . . . . . 51, 52, 53

*United States v. Sabhnani*,
599 F.3d 215 (2d Cir. 2010) . . . . . . . . . . . . . . . . 43

*United States v. Salmonese*,
352 F.3d 608 (2d Cir. 2003) . . . . . . . . . . . . . . . . 33

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . . . *passim*

*United States v. Zingaro*,
858 F.2d 94 (2d Cir. 1988) . . . . . . . . . . . . . . 33, 34

v

PAGE

*Williams v. Binance*,
    96 F.4th 129 (2d Cir. 2024) . . . . . . . . . . . . . . 44, 45

*Statutes, Rules & Other Authorities*:

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 42

15 U.S.C. § 78aa . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

15 U.S.C. § 78ff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

17 C.F.R. § 240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3237(a) . . . . . . . . . . . . . . . . . . . . . . . . . 42

Daniel M. Gallager, *Move Over Tickertape, Here
    Comes the Cyber-Exchange: The Rise of Internet-
    Based Securities Trading Systems*, 47 Cath. Univ.
    L. Rev. 1009 (1998) . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Crim. P. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . 41

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . 41

U.S. Const. art. III § 2 . . . . . . . . . . . . . . . . . . . . . . . 41

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-2239

———————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

AMIT DAGAR, also known as Sealed Defendant 1,

*Defendant-Appellant,*

ATUL BHIWAPURKAR, also known as Sealed
Defendant 2,

*Defendant.*

———————————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————————

### Preliminary Statement

Amit Dagar appeals from a judgment of conviction entered on August 24, 2024, in the United States District Court for the Southern District of New York, following a seven-day jury trial before the Honorable Andrew L. Carter, Jr., United States District Judge.

Superseding Indictment S1 23 Cr. 319 (ALC) (the "Superseding Indictment") was filed on December 13,

2

2023, in two counts. Count One charged Dagar with securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. Count Two charged Dagar with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371.

Trial commenced on January 9, 2024, and ended on January 18, 2024, when Dagar was convicted on both counts in the Superseding Indictment.

On August 6, 2024, Judge Carter sentenced Dagar to nine months of imprisonment, to be followed by three years of supervised release, imposed a $200 special assessment, and ordered forfeiture of $272,861.99.

Dagar is on bail pending appeal.

### Statement of Facts

At trial, the Government presented "overwhelming evidence," as Judge Carter found, that Dagar, a Pfizer employee, participated in an insider trading scheme. (Dkt. 127 at 3).[1] Dagar purchased Pfizer stock options based on material non-public information about one of Pfizer's clinical trials of Paxlovid, a drug treatment for COVID-19, in violation of duties of trust and confidence that Dagar owed to his employer. On the

_____

[1]   "Dkt." refers to an entry on the District Court's docket for this case; "Br." refers to Dagar's brief on appeal; "A." refers to the appendix filed with that brief; "GX" refers to a Government exhibit at trial; and "Tr." refers to the trial transcript. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

3

morning of November 4, 2021, Dagar's supervisor, Kawleen Oberoi, sent Dagar electronic messages indicating that Oberoi had learned the outcome of the trial, that the results were positive, and that a press release would be issued the next day. A few hours later, and while the information remained confidential, Dagar purchased call options for Pfizer stock. Dagar also tipped Atul Bhiwapurkar and, approximately two hours after Dagar placed his trades, Bhiwapurkar also purchased Pfizer call options.

The next day, November 5, 2021, Pfizer issued a press release, before the market opened, that publicly announced the results of the Paxlovid study. Following the publication of the positive results, Pfizer's stock price increased substantially that day, opening—and eventually closing—more than 10% higher than the prior day's closing price. Dagar and Bhiwapurkar later sold their Pfizer call options at significant profits, totaling more than $349,000. Overall, Dagar spent $8,773 on Pfizer call options and realized gains of approximately $272,861.99, for a profit of more than 3,000%. Bhiwapurkar spent approximately $7,426 on Pfizer call options and realized gains of approximately $76,279, for a profit of more than 900%.[2]

---

[2] On October 19, 2023, Bhiwapurkur pleaded guilty to one count of securities fraud, pursuant to a plea agreement with the Government. (Dkt. 37).

4

## A. The Government's Case

### 1. Pfizer Trains Dagar on Its Policies Prohibiting Insider Trading

Pfizer is a pharmaceutical company headquartered in New York, New York. (Tr. 51). Its stock is publicly traded on the New York Stock Exchange, which is also headquartered in New York, New York. (Tr. 488).

Pfizer hired Dagar in 2018. (GX 224). Dagar worked as a senior statistical programming lead and was part of a team responsible for summarizing data in clinical drug trials. (Tr. 155, 160).

Pfizer had written policies that prohibited employees, like Dagar, from trading securities based on material non-public information obtained during their employment. On several occasions, Pfizer trained Dagar on these policies, and Dagar certified that he read, understood, and agreed to abide by these policies. (GX 218, 224). For example, in 2019, Dagar pledged that he read and agreed to abide by the policies set forth in Pfizer's "Blue Book," which stated, among other things: "[I]t is illegal to buy or sell securities . . . of a company when you are aware of 'inside information'—material, nonpublic information—relating to the company. Securities laws and Pfizer policy prohibit you from using or disclosing any inside information that you may acquire during the course of your employment at Pfizer." (Tr. 367-69; GX 212). The Blue Book included as an example of such "material" information "important developments (e.g. clinical trial results, regulatory decisions)." (Tr. 370; GX 212). Dagar also completed an online training about these policies

in 2019. (Tr. 372-73; GX 213). During a "knowledge check" portion of the training, Dagar was asked, "Which of the following is an example of insider trading?"—and he selected the correct answer: "Mark advises friends to purchase stock in Pfizer because of a potential drug breakthrough that is not public knowledge." (Tr. 376-78; GX 213, 214). In February 2021, Dagar reaffirmed that he read, understood, and agreed to abide by Pfizer's insider trading policies. (Tr. 379-82; GX 215, 216, 224).

### 2. Pfizer Conducts a Clinical Trial of Paxlovid on High-Risk Patients

In early 2021, Pfizer began developing Paxlovid, an oral medication used to treat the virus that causes COVID-19. (Tr. 51-52, 76, 152). By the summer and fall of 2021, hospitalizations and deaths were surging as a result of the pandemic. (Tr. 77). While vaccines were becoming available, Paxlovid was designed to treat patients, both vaccinated and unvaccinated, who contracted COVID-19. (Tr. 77).

Pfizer conducted three different Paxlovid trials, or studies, in 2021. (Tr. 78). One of those trials, the EPIC-HR trial, involved unvaccinated patients who were at high risk for progression to severe COVID-19. (Tr. 56). The primary purpose of the EPIC-HR trial, which enrolled its first patient in July 2021, was to demonstrate that Paxlovid could significantly reduce rates of hospitalization and death due to COVID-19 in the high-risk patient population. (Tr. 80). The EPIC-HR trial was conducted as a double-blind study, meaning that neither the patient nor the clinical study team knew

6

whether the patient had been given a placebo or the active drug in the trial. (Tr. 80-81). A small "unblinded" team within Pfizer, however, had access to this information to monitor the safety of the drug as the trial progressed; everyone else was on the "blinded" side of the study. (Tr. 81-82).

Dagar was part of the "blinded" EPIC-HR team. (Tr. 160). Dagar's team, supervised by Oberoi, was responsible for summarizing the trial's data in tables, listings, and figures. (Tr. 155). The trial was governed by written protocols, which were stamped "confidential" and were emailed to Dagar and other members of the EPIC-HR team, including the "blinded" team. (Tr. 83, 91-92, 96; GX 208, 208A, 209, 209A, 210, 210A).

The EPIC-HR study, which was designed to enroll approximately 3,000 patients, included several milestones. (Tr. 85-86). The first milestone was the "sentinel cohort safety review," which involved an analysis of the results for the study's first 60 patients to ensure that Paxlovid was safe. (Tr. 87). Paxlovid cleared that first milestone in August 2021 and the trial continued. (Tr. 87-88). The fact that the trial had cleared that milestone was communicated to the trial team at Pfizer—including to Dagar's team and other individuals on the blinded side—but the information was expected to be kept confidential within Pfizer and was not made public. (Tr. 87-88, 162-64).

The second milestone was the "proof of concept assessment," which involved an analysis of the results for the study's first 200 patients to ensure that Paxlovid was effective in inhibiting the ability of the

COVID-19 virus to grow in a patient. (Tr. 88). Paxlovid cleared that second milestone in September 2021 and the trial continued. (Tr. 88). The fact that the trial had cleared that second milestone was communicated to the trial team, including Dagar's team and others on the blinded side, but was expected to remain confidential within Pfizer and was not made public. (Tr. 89, 164-65).

The third milestone was the "formal interim analysis," which involved an analysis of the results about halfway through the trial. (Tr. 89). The interim analysis for the EPIC-HR trial was conducted in October and November 2021. (Tr. 90). Like the first two milestones, the fact that an interim analysis was being done at all was not publicly announced and was expected to be kept confidential within Pfizer. (Tr. 90). Dagar, Oberoi, and their team provided tables, listings, and figures summarizing the trial's data to the Data Monitoring Committee (the "DMC")—the committee responsible for reviewing the underlying data from the EPIC-HR trial and deciding next steps—and performed other work in connection with each of the study's three milestones. (Tr. 163-65, 232).

As designed, there were four possible outcomes of the EPIC-HR interim analysis, which were set out in the governing protocols that Dagar received: (1) the trial would be stopped because the results to that point had shown that Paxlovid was overwhelmingly effective; (2) the trial would continue as designed because the results to that point had been favorable, but not overwhelmingly effective; (3) the trial would continue with an adjusted sample size; or (4) the trial would be

8

stopped because the results to that point had shown that Paxlovid was ineffective and therefore continuing the trial would be futile. (Tr. 92-93, 165-68; GX 209, 209A, 210, 210A). Under the study's protocols, the interim analysis was the first point in time that the trial could be stopped for efficacy. (Tr. 94).

The DMC was scheduled to meet on November 3, 2023 to review the data from the interim analysis and recommend one of the four possible outcomes. (Tr. 98, 100; GX 206). Dagar and other members of the trial team knew that the meeting would take place that day and that the purpose of the meeting was for the DMC to recommend one of the four outcomes. (Tr. 98, 100, 232-34, 247; GX 206). In fact, Dagar and his team had done "a lot of work" in connection with the interim analysis and the DMC meeting. (Tr. 232). If the interim analysis showed overwhelming efficacy, Pfizer's plan was, on an expedited timeline, to publicly announce the results, seek emergency use authorization for Paxlovid from the health authorities (like the FDA), and later submit a new drug application ("NDA"). (Tr. 94-95, 98-99). A document detailing Pfizer's plans—which Dagar received—outlined that, in the event of overwhelming efficacy, Pfizer intended to issue a press release within a day of the DMC meeting and then submit an emergency use authorization application for Paxlovid in less than two weeks. (GX 209, 209A). In short, if the results were overwhelming efficacy, Pfizer's plans contemplated a lot of work over a short period of time for the trial team, including for Dagar and his team. (Tr. 99, 240-41).

9

On November 3, 2021, the DMC met as scheduled and recommended that the EPIC-HR study be stopped for overwhelming efficacy. (Tr. 101).

### 3. Dagar Learns Material Non-Public Information about the Study's Results, Including When the Results Will Be Announced

The next day, on November 4, 2021, Pfizer had not yet publicly announced that the EPIC-HR trial was ending or that the results of the interim analysis were positive; that information was still confidential. (Tr. 102). At 5:54 a.m. on November 4, 2021, Oberoi received an email from a high-level Pfizer employee (Kannan Natarajan), who was several levels above Oberoi in the chain of command. (Tr. 252-53; GX 202). The email stated, in part:

> Good Morning! Since you are unblinded to the results, I'm reaching out to let you know we met last night [and] the decision is to file the NDA [New Drug Application] as soon as possible. Please do whatever you can today to start this process including the TLFs [tables, listings, and figures] for secondary analysis. The press release will be out tomorrow morning.

(GX 202; Tr. 256). Oberoi testified at trial that this email "never should have been sent to" him because he "was on the blinded side of the study team," but that Natarajan thought that Oberoi was unblinded to the results. (Tr. 252). The reference to filing "the NDA as soon as possible" indicated to Oberoi that the results

10

of the interim analysis were overwhelming efficacy, which Oberoi did not know before receiving this email. (Tr. 255-56). In response to the email, Oberoi wrote, in part: "Great news! I have been the blinded member of the team, but let me reach out to [another Pfizer employee] for guidance with next steps and we will expedite the work on our end." (GX 202).

Shortly after receiving the email from Natarajan, and still on November 4, 2021, Oberoi communicated with Dagar via electronic chat. Those communications included the following messages at the associated times:

> Oberoi (8:50 a.m.): we got the outcome
>
> Oberoi (8:51 a.m.): *lag gayee hamari* ["we are screwed" in Hindi]
>
> Dagar (8:51 a.m.): oh really
>
> Oberoi (8:51 a.m.): lot of work lined up
>
> Dagar (8:51 a.m.): yeah. screwed
>
> Oberoi (8:51 a.m.): have to find the details
>
> Dagar (8:52 a.m.): officially *kal pata chalega* ? ["Is it tomorrow that we will know officially" in Hindi]
>
> Oberoi (8:53 a.m.): press release tomorrow
>
> Oberoi (8:54 a.m.): we may know today
>
> Dagar (8:54 a.m.): ok

11

> Oberoi (8:54 a.m.): since people will ask
> for un-blinded results
>
> Dagar (8:54 a.m.): yeah
>
> Dagar (8:54 a.m.): kind of exciting

(GX 203, 1004; Tr. 260). Oberoi testified that he was communicating to Dagar in these messages that the results of the interim analysis were overwhelming efficacy ("we got the outcome"), and that, as a result, there would be a lot of work to do ("we are screwed"; "lot of work lined up"). (Tr. 260-62; 265). Oberoi wanted to tell Dagar that the drug trial had been successful, that there was a lot of work to be done, and that a press release would be coming out, because of the "significant amount of work that ha[d] to be done in the days ahead" and because Oberoi and Dagar were the ones who would "have to move things faster with everyone else in the programming group who worked with [them]." (Tr. 265).

### 4. Dagar and Bhiwparkur Buy Pfizer Call Options Based on Material Non-Public Information

A few hours after exchanging the messages with Oberoi above—at approximately 1:21 p.m. on November 4, 2021—Dagar purchased 665 Pfizer call option contracts for $8,773.20 through a Fidelity trading account. (GX 102, 103, 401). A call option contract gives its holder the right, but not the obligation, to buy a certain amount of stock (usually 100 shares) at a certain price (the strike price) before a certain time (the expiration date). (Tr. 467-68). In essence, a call option is a bet that the market price of a stock will go up and

12

exceed the strike price before the option expires, entitling the holder of the option contract to buy the stock at a below-market price. (Tr. 468). If the market price of the stock does not go above the strike price by the expiration date, the call option contract expires worthless and the holder loses the entire investment. (Tr. 468-70). Accordingly, the holder of a call option contract is hoping that a stock's price will go as far above the strike price as possible before the expiration date. (Tr. 470).

The 665 Pfizer call options that Dagar bought on November 4, 2021 gave him the right to buy 66,500 shares of Pfizer stock. (Tr. 486). Of the 665 contracts, 200 had a strike price of $44 and an expiration date of November 5, 2021 (*i.e.*, the next day); 265 had a strike price of $45.55 and an expiration date of November 12, 2021; and 200 had a strike price of $46 and an expiration date of November 19, 2021. (GX 401). After 3:00 p.m. on November 4, 2021, Atul Bhiwparkur purchased 200 Pfizer call option contracts with a strike price of $45 for a total of $7,426. (Tr. 494). The closing price of Pfizer stock on November 4, 2021, was $43.85. (GX 121).

Before November 4, 2021, Dagar used his trading account at Fidelity and another account with Robinhood to buy and sell stocks and options, going back to at least 2017. (Tr. 498-99). Dagar used these accounts "thousands" of times to buy and sell options. (Tr. 498-99). The first time Dagar purchased any Pfizer

13

security of any kind, however, was on November 4, 2021. (Tr. 499).[3]

### 5. Pfizer Announces the Results of the EPIC-HR Interim Analysis, Its Stock Price Jumps, and Dagar and Bhiwparkur Sell Their Pfizer Call Options for a Big Profit

On November 5, 2021, at approximately 6:45 a.m., Pfizer issued a press release announcing for the first time that Paxlovid reduced the risk of hospitalization or death by 89% in the EPIC-HR interim analysis, that Pfizer was stopping enrollment in the EPIC-HR study due to the overwhelming efficacy demonstrated by the results of the interim analysis, and that Pfizer planned

_____

[3] In 2021, Dagar suffered significant losses from his options trading, which, the Government argued at trial, gave him a motive to commit the charged offenses. In that year, Dagar purchased options contracts in 19 companies, only 3 of which (including Pfizer) resulted in profits. (GX 401). For the other 16 companies, Dagar's losses totaled approximately $444,037. (Tr. 501-03; GX 401). Fidelity sometimes sent Dagar letters ensuring that he was aware of the significant losses he was experiencing. (Tr. 503-05; GX 105 at 1 (April 6, 2021 letter informing Dagar "that last month, 256 trades were executed in your above-referenced account and that the overall equity value of your account decreased by $86,250.55"); GX 105 at 2 (October 6, 2021 letter information Dagar "that over the last month, . . . 146 trades were executed and your overall equity value has decreased by $35,154.59")).

14

to submit the data to the FDA for emergency use authorization as soon as possible. (Tr. 103-04; GX 201A). There was no advance announcement to the public that a press release was going to be issued before it was released on the morning of November 5, 2021, and the fact that a press release was going to be issued about the results of the interim analysis for EPIC-HR was considered confidential within Pfizer. (Tr. 437).

When the market opened, Pfizer's stock price jumped from a closing price of $43.85 per share on November 4, 2021, to an opening price of $48.09 per share on November 5, 2021. (GX 121). Pfizer's closing price on November 5, 2021 was $48.61, a more than 10 percent increase from the prior day's closing price. (Tr. 494; GX 121).

On November 5, 2021, Dagar sold 200 of his 665 Pfizer call options, and he sold the rest on November 12, 17, and 19, 2021, for a total profit of $272,861.99. (GX 401). Bhiwaparkur sold his Pfizer call options on November 5, 10, 11, and 17, 2021, for a total profit of $76,279. (GX 401).

Bhiwaparkur's cellphone, which was searched and seized in January 2023, indicated that Dagar and Bhiwaparkur exchanged WhatsApp messages on November 4, 5, 10, 11, and 17, 2021—*i.e.*, the days on which Bhiwaparkur bought and sold his Pfizer call options— but those messages appeared as deleted on Bhiwaparkur's phone. (Tr. 583-84; GX 306, 307). No other messages between Dagar and Bhiwaparkur from the approximately one year before November 4, 2021, appeared as deleted on Bhiwaparkur's phone. (Tr. 596-97). Dagar's cellphone, which was also searched and

15

seized in January 2023, also indicated that WhatsApp messages between Dagar and Bhiwaparkur exchanged on November 5, 10, and 11, 2021 had been deleted. (Tr. 620-22; GX 303).

### 6. Dagar Admits His Trading to Oberoi

In January 2023, the FBI interviewed Oberoi about Dagar. (Tr. 268-69). Later that same day, Oberoi spoke to Dagar, who told Oberoi that he had also been visited by the FBI. (Tr. 270-71). During their conversation, Dagar asked Oberoi if he had traded any Pfizer securities around the time of the interim analysis, to which Oberoi said no. (Tr. 270). According to Oberoi, Dagar "may have said that, since you did not do anything, you shall be fine." (Tr. 272). Oberoi further summarized their conversation: "And he said he doesn't know what got into his mind. It was really at the spur of the moment, not sure what he was thinking, but he did place a trade on that date." (Tr. 271). Oberoi also testified that Dagar "sounded very, very low" and "very apologetic, regretful, even though he is a very cheerful individual." (Tr. 271-72).

## B. The Defense Case and Verdict

In addition to vigorous cross-examination of the Government's witnesses, Dagar called one witness: Laura Allen, a paralegal who summarized trades from one of Dagar's trading accounts. (Tr. 749-58).

On January 18, 2024, the jury found Dagar guilty of both counts.

16

## C. Dagar's Post-Trial Motions

At the close of the Government's case, Dagar moved for a judgment of acquittal, which the District Court denied. (Tr. 748). On February 8, 2024, Dagar moved again for a judgment of acquittal, arguing that the evidence was insufficient to sustain his convictions and that the Government had failed to prove venue in the Southern District of New York ("SDNY"). (Dkt. 106). On May 23, 2024, the District Court denied Dagar's motion. (Dkt. 127).

## D. Dagar's Sentencing

On August 6, 2024, Judge Carter sentenced Dagar to nine months of imprisonment, to be followed by three years of supervised release, imposed a $200 special assessment, and ordered forfeiture of $272,861.99. (Dkt. 135).

Dagar does not challenge any aspect of his sentence on appeal.

## A R G U M E N T

## POINT I

## There Was No Constructive Amendment of the Superseding Indictment

Dagar argues that the Superseding Indictment was constructively amended at trial because the jury was permitted to convict him "based on evidence other than proof that [he] actually knew the results of the Paxlovid trial." (Br. 26). Judge Carter correctly

rejected this argument multiple times both before and during trial. The Superseding Indictment charged Dagar in broad and general terms with purchasing Pfizer securities based on material non-public information about Pfizer's Paxlovid trial, not just Dagar's knowledge of "the results" of the Paxlovid trial. It also specifically identified Dagar's knowledge of the forthcoming press release. Dagar's arguments ignore the plain text of the Superseding Indictment and the considerable flexibility the law affords the Government's proof at trial.

## A.  Relevant Facts

### 1.  The Superseding Indictment

The Superseding Indictment charged Dagar with trading Pfizer stock options based on material non-public information and conspiring with another person to do so. (A. 34). The very first paragraph of the Superseding Indictment broadly alleged that the material non-public information was information about Pfizer's Paxlovid trial, not just "the results" of the trial:

> In or about November 2021, AMIT DAGAR, the defendant, participated in an insider trading scheme to reap illicit profits from options trading based on material non-public information ("MNPI") *about clinical trials of Paxlovid*, a drug treatment for COVID-19. In furtherance of that scheme, DAGAR, in violation of duties of trust and confidence that he owed to his employer, Pfizer Inc. ("Pfizer"), obtained MNPI *about one of*

18

> *Pfizer's clinical trials of Paxlovid* and
> then utilized that MNPI to trade Pfizer
> stock options. DAGAR further provided
> MNPI *about the Paxlovid trial* to a co-
> conspirator ("CC-1") with the intent that
> CC-1 would likewise trade on that infor-
> mation, following which CC-1 also traded
> Pfizer stock options based on the MNPI.

(A. 34 (emphases added)). In contrast, the language in
the first paragraph of the original Indictment did refer
to "the results" of the trial.[4]

––––––––––

4   The first paragraph of the original Indictment
stated:

> In or about November 2021, AMIT
> DAGAR and ATUL BHIWAPURKAR,
> the defendants, and others known and
> unknown, participated in an insider trad-
> ing scheme to reap illicit profits from op-
> tions trading based on material non-pub-
> lic information ("MNPI") *about the results
> of clinical trials of Paxlovid*, a drug treat-
> ment for COVID- 19. In furtherance of
> that scheme, DAGAR, in violation of du-
> ties of trust and confidence that he owed
> to his employer, Pfizer Inc. ("Pfizer"), ob-
> tained MNPI *about the results of Pfizer's
> clinical trial of Paxlovid* and then utilized
> that MNPI to trade Pfizer stock options.
> DAGAR further provided MNPI *about the
> Paxlovid results* to BHIWAPURKAR

19

The Superseding Indictment later continued that, "[d]uring the course of his employment," Dagar "learned information about the relevant study and its results before the public. For example, on or about November 4, 2021, [Dagar] learned that Pfizer was stopping the relevant study because the results were positive, and that a press release would be issued the next day about the results." (A. 35). The Superseding Indictment described the electronic messages Oberoi sent Dagar on November 4, 2021, which indicated that Oberoi "had learned the outcome of the drug trial, that the results were positive, that [Dagar] should prepare for some hard work ahead, and that a press release would be issued the next day." (A. 35; *see also* A. 38 (describing Dagar's communications with Oberoi on November 4, 2021, through which Dagar learned that "the outcome of the trial was positive" and that "there would be a press release about the trial's results the following day.")).

Moreover, the statutory allegations of the Superseding Indictment were not limited to "the results" of

—————

        with the intent that BHIWAPURKAR would likewise trade on that information. BHIWAPURKAR, knowing of DAGAR's breach of duty, then also traded Pfizer stock options based on the MNPI, and recommended to another individual ("Individual-1") that Individual-1 trade in Pfizer securities, which Individual-1 did.

(A. 22 (emphases added)).

20

the EPIC-HR study. The "to wit" clause of Count One charged that "in knowing violation of duties owed by [Dagar] to Pfizer, [Dagar] used material non-public information obtained from Pfizer to execute, and cause and assist another to execute, the purchase of Pfizer call option contracts." (A. 41).

### 2. Dagar's Constructive Amendment Motion *in Limine*

Before trial, Dagar argued in a motion *in limine* that the only material non-public information upon which the Government was permitted to rely without constructively amending the Superseding Indictment was that "Dagar knew about the positive outcome of the Paxlovid trial." (Dkt. 65 at 10-14). The Government opposed Dagar's motion and argued that, "[w]hile it is true that the defendant's knowledge that the results of the trial were positive is one aspect of the Government's theory, the Government has consistently described and explained that the defendant knew additional information about the Paxlovid drug trial that was both confidential and material." (Dkt. 65 at 10). The Government continued, "[a]lthough the Government expects to introduce evidence that the defendant knew the results were positive, as the defendant himself acknowledges, the Superseding Indictment also alleges that the defendant knew 'that a press release would be issued the next day about the results.'" (Dkt. 65 at 10).

Judge Carter denied Dagar's motion. (Dkt. 83 at 16-21). In doing so, he observed that whether "the fact of the upcoming issuance of a press release by Pfizer

21

constitutes material non-public information," "coupled with this other information that Dagar had," was a question "for the jury to determine." (Dkt. 83 at 16).

### 3. The Summations and Dagar's Renewed Constructive Amendment Motion

At trial, consistent with the allegations in the Superseding Indictment and its opposition to Dagar's motion *in limine*, the Government pursued both (1) a primary theory—that Dagar knew the results of the Paxlovid trial were overwhelming efficacy, which was material non-public information, when he bought Pfizer call options; and (2) an alternative theory—that, even if Dagar did not know the results were overwhelming efficacy, he knew that a press release would be issued the next day about the results, which was still material non-public information, when he bought Pfizer call options.

During its summation, the Government argued both theories. It framed the first key question for the jury as: "Did the defendant trade based on material, nonpublic information about [Paxlovid] when he bought those options?" (Tr. 781). The Government argued that what Dagar knew about the Paxlovid trial before he received the November 4 Oberoi messages helped confirm for him that, when Oberoi said, "we got the outcome," the "outcome" was overwhelming efficacy. The Government argued:

> You know from the evidence that even before Mr. Oberoi told him the outcome of the interim analysis on November 4, the defendant had a lot of material,

22

> nonpublic information about Paxlovid because of his job at Pfizer.
>
> I'm going to walk through some of this inside information because it is critically important information that the defendant knew when he purchased Pfizer call options on November 4. It is what allowed the defendant to quickly leap into action and buy Pfizer call options just a few hours after getting those messages from Oberoi on November 4.

(Tr. 781). The Government then outlined information Dagar knew about the structure, timing, and milestones of the trial before Oberoi told him about the outcome and the press release on November 4. (Tr. 781-89). The Government continued: "The defendant knew this inside information before Oberoi messaged him about the outcome on November 4. It's this context which helped make clear to the defendant when he got those messages from Oberoi that the results were overwhelming efficacy." (Tr. 789-90). The Government proceeded to argue that when Oberoi told Dagar, "We got the outcome," Dagar knew what outcome Oberoi meant—"[t]he outcome everyone had been hoping for and working so hard for, overwhelming efficacy." (Tr. 791).

The Government then summarized its evidence on the question, "how did the defendant know on November 4 that the results were overwhelming efficacy?": (1) Dagar "knew it had cleared the safety cohort and the proof-of-concept assessment"; (2) Dagar "knew the DMC met the night before and that there was only one

23

of four possible outcomes"; (3) "Oberoi told him, 'We got the outcome,' the one everyone had been hoping for"; (4) Dagar "was told that there was a lot of work lined up and that they were screwed"; (5) Dagar "was told that a press release would be issued tomorrow consistent with Pfizer's plans"; (6) Dagar described what Oberoi told him as "kind of exciting"; and (7) "the biggest reason why you [the jury] know the defendant knew it was overwhelming efficacy? A few hours later, he went out and bought Pfizer call options for the first time." (Tr. 796). The Government concluded this portion of its argument: "The combination of all of this information in its full context told the defendant that the results were overwhelming efficacy. Because the defendant knew this valuable confidential information, that's what allowed him to go out that afternoon and buy his call options." (Tr. 796).

The Government then addressed an attack on its primary theory that the defense made throughout trial. The Government made clear that, contrary to the defense's claims, the Government was not arguing that Dagar knew, on November 4, that Paxlovid was 89 percent effective in reducing the risk of hospitalization or death from COVID-19; instead, the Government was arguing that he knew it was overwhelmingly effective. (Tr. 799-800). The Government then stated: "The question for you is this. Was the information that the defendant did know on November 4 material nonpublic information?" (Tr. 800). The Government proceeded to argue that "for all the reasons we have discussed, if you had told any investor on November 4, 2021 that Paxlovid was overwhelmingly effective without mentioning that 89 percent number, if you had told

24

them that and that the results were being announced the next day, any investor would have said of course that information about a life-saving drug in the middle of a global pandemic is absolutely material." (Tr. 800-01).

The Government then proceeded to argue its alternative theory—that Dagar's knowledge of the forthcoming press release, in the context of everything else he knew about the trial, was material non-public information:

> At various points throughout this trial, the defense has suggested that the defendant did not know on November 4 that the results of the Paxlovid trial were overwhelming efficacy. Now, I have just been through all of the evidence which shows you that the defendant did know it was overwhelming efficacy. But here's another very important thing for you to keep in mind during your deliberations. Even if the defendant did not know for certain that the results were overwhelming efficacy, he is still guilty of insider trading. Again, this is so important. You will excuse me. I have to repeat it. Even if the defendant did not know for certain that the results were overwhelming efficacy, he is still guilty of insider trading. Because without question, on November 4 he knew that it cleared the safety milestone and the proof of concept assessment. He knew the DMC had met the

25

night before to decide and that there was only one possible outcome of four. And he knew that in the event of overwhelming efficacy, a press release would be issued, whatever that might be, the next day.

On November 4, even just this information was still material nonpublic information. To trade on even just this information is still cheating. It's still insider trading. Because remember, the public did not know this, didn't know that an interim analysis was going on or that the trial could be stopped for overwhelming efficacy as soon as November 5, and they didn't know that an announcement about the results would be coming the next day. The defendant knew all of that, and it gave him an opportunity to place a bet on November 4, before the news came out, an opportunity to place a bet that other investors did not have. . . .

Other investors, however, didn't have the same opportunity the defendant had. In other words, the defendant knew exactly when the horse race was being run—the next day—and other investors didn't. He knew the news about Paxlovid was coming out the next day, and other investors didn't. So he was able to place a bet before it happened. That is still cheating and that's still insider trading. No matter how you slice it, the evidence has shown that

26

> on November 4 the defendant bought
> Pfizer call options based on material non-
> public information.

(Tr. 801-03).

At the conclusion of its summation, the Government addressed the elements of the offenses, including the element that "the defendant violated his duty of trust and confidence by using material nonpublic information that he obtained by virtue of his relationship with Pfizer to trade in Pfizer securities for his personal benefit." (Tr. 810). The Government argued that Dagar "knew the results were overwhelming efficacy, and even if he didn't, which he did, the fact that a press release would be issued the next day about the results of the Paxlovid drug trial, combined with the fact that one of only four possible outcomes was overwhelming efficacy, was still material nonpublic information." (Tr. 810).

In his summation, Dagar generally argued that he did not know that the results were overwhelming efficacy before he placed his trades and that the other confidential information he knew was not material. (Tr. 817). Before continuing his summation for a second day, Dagar filed a motion arguing that the Government's summation constructively amended the Superseding Indictment because "Dagar's alleged knowledge of the results of the Paxlovid trial is the sole material nonpublic information the indictment charges him with trading on." (Dkt. 88 at 2). As a remedy, Dagar sought to have a copy of the Superseding Indictment provided to the jury during its deliberations and to have the District Court instruct the jury

27

that "in order for the Government to prove that the De-
fendant committed securities fraud, you must be sat-
isfied beyond a reasonable doubt that the Defendant
knew that Pfizer was stopping the Paxlovid study, that
the results of the Paxlovid interim analysis were posi-
tive, and that a press release would be issued the next
day about those positive results." (Dkt. 88 at 4).

The District Court denied Dagar's motion.
(Tr. 882). As to what the material non-public infor-
mation alleged in the Superseding Indictment was,
Judge Carter noted that the language of the Supersed-
ing Indictment is "fairly general." (Tr. 871). He contin-
ued that it is "clear" that "one of the items of material
nonpublic information that Dagar possessed, accord-
ing to the government in the indictment, was that a
press release would be issued the next day about the
results." (Tr. 871-72). Judge Carter ruled that other
information, such as the "milestones," "seem like they
are still in the category of knowledge of the results."
(Tr. 874). Dagar continued his summation after the
District Court's ruling.

In its rebuttal summation, the Government again
argued that the jury could convict Dagar even if he did
not know that the results of the trial were overwhelm-
ing efficacy:

> You have seen evidence of the defendant
> learning and receiving confidential infor-
> mation, information that any outsider in-
> vestor would have loved to have. He knew
> the Paxlovid drug trial had passed a
> safety milestone. He knew it had passed
> a milestone about effectiveness. And he

28

knew, on November 4, that a press release would come out the very next day with the results. Just that information, taken together, is material nonpublic information.

And even if you don't find that he knew that the outcome was overwhelming efficacy, which you can and you should, you can convict based on the material nonpublic information that I have just described.

(Tr. 903-04).

## B.  Applicable Law

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018). "To prevail on a constructive amendment claim," the "defendant must demonstrate that the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012). "The charge has been so altered either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered.'" *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021).

29

"[P]roof at trial need not, indeed cannot, be a pre-cise replica of the charges contained in an indictment." *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983). Thus, this Court "has consistently permitted significant flexibility in proof, provided that the de-fendant was given notice of the core of criminality to be proven at trial." *D'Amelio*, 683 F.3d at 417. "The 'core of criminality' of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside the pur-view." *Id.* at 418. Accordingly, no constructive amend-ment occurs "when the proof at trial does no more than supply the particulars" of the crime, *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016), or when an indictment's allegations and the proof at trial both relate to a "single set of discrete facts" or form "part of a single course of conduct" with the same "ultimate purpose," *D'Amelio*, 683 F.3d at 419-21.

## C. Discussion

The Superseding Indictment was not construc-tively amended at trial. The "core of criminality" in the Superseding Indictment was that Dagar purchased Pfizer call options based on material non-public infor-mation about Pfizer's Paxlovid trial and that he con-spired with another person to do so. That is also what the Government argued at trial.

The Superseding Indictment broadly charged that Dagar traded Pfizer call options based on material non-public information about the Paxlovid trial. (*See, e.g.,* A. 34, ¶ 1 (Dagar traded based on material non-public information "about clinical trials of Paxlovid";

30

Dagar obtained "MNPI about one of Pfizer's clinical trials of Paxlovid and then utilized that MNPI to trade Pfizer stock options"; Dagar "provided MNPI about the Paxlovid trial to a co-conspirator"); A. 35, ¶ 3 ("Dagar learned information about the relevant study and its results before the public. For example, on or about November 4, 2021, DAGAR learned that Pfizer was stopping the relevant study because the results were positive, and that a press release would be issued the next day about the results."); A. 40-41, ¶ 19 (Dagar "used material non-public information obtained from Pfizer to execute, and cause and assist another to execute, the purchase of Pfizer call option contracts")). To be sure, the Government's primary argument at trial was that Dagar bought Pfizer call options because he learned from Oberoi that the results of the EPIC-HR interim analysis were overwhelming efficacy. But the broad language of the Superseding Indictment, as well as its specific references to the press release, easily encompassed the Government's alternative argument that, even if Dagar did not know the results of the trial (overwhelming efficacy), he indisputably knew how and when the results of the trial would be made public (in a press release the next day). That information about the forthcoming press release about the trial's results, given all the other relevant context and knowledge the defendant had about the Paxlovid trial, constituted material non-public information about the trial within the bounds of the Superseding Indictment.

Dagar's argument that "[e]very single allegation in the . . . indictment relating to material nonpublic information concerns information about the positive results of the Paxlovid trial that Dagar allegedly learned on

31

November 4, 2021" simply ignores the broad language in the Superseding Indictment, including the language quoted above from Paragraphs 1, 3, and 19. Most notably, Dagar overlooks the Superseding Indictment's specific allegation that the material non-public information included "that a press release would be issued the next day about the results." (A. 35, ¶ 3).

Dagar also badly contorts and misconstrues the Government's summation. As set forth above, the Government argued in summation that Dagar learned from Oberoi that the results of the Paxlovid study were overwhelming efficacy and that a press release would be issued the next day. In the alternative, the Government argued that, even if Dagar did not know the results were overwhelming efficacy, his knowledge that a press release would be published the next day (in the context of everything else he knew about the study) "gave him an opportunity to place a bet on November 4, before the news came out, an opportunity to place a bet that other investors did not have." (Tr. 802). Dagar "knew exactly when the horse race was being run—the next day—and other investors didn't," and "[s]o he was able to place a bet before it happened." (Tr. 803).

Contrary to Dagar's claim, the Government did not argue that Dagar traded based on his "knowledge of the Paxlovid clinical trial more generally," such as his knowledge that the trial cleared certain milestones, rather than his knowledge of the results or the forthcoming press release. (Br. 28). Instead, the Government argued that Dagar's knowledge of the trial more generally was "what allowed the defendant to quickly leap into action and buy Pfizer call options just a few

32

hours after getting those messages from Oberoi on November 4." (Tr. 781). In other words, it was the "context which helped make clear to the defendant when he got those messages from Oberoi that the results were overwhelming efficacy." (Tr. 789-90; *see also* Tr. 796 ("The combination of all of this information in its full context told the defendant that the results were overwhelming efficacy.")). And as part of its alternative argument, the Government made clear that Dagar's knowledge of the Paxlovid clinical trial more generally combined with his knowledge that a press release would be issued the next day (which he learned from Oberoi) was what "gave him an opportunity to place a bet on November 4: before the news came out." (Tr. 802, 803).

But even if the Government's argument were construed as an argument that Dagar traded based solely on his "knowledge of the Paxlovid clinical trial more generally," that too would not have been a constructive amendment of the Superseding Indictment because of its broad language about the Paxlovid trial without restriction. (*See, e.g.*, A. 34, ¶ 1 (MNPI "about clinical trials of Paxlovid"; "MNPI about one of Pfizer's clinical trials of Paxlovid"; "MNPI about the Paxlovid trial"); A. 35, ¶ 3 ("information about the relevant study"); A. 40-41, ¶ 19 ("material non-public information obtained from Pfizer")). At bottom, the proof at trial did "no more than supply the particulars of the crime," *Daugerdas*, 837 F.3d at 225, and the Superseding Indictment's allegations and the proof at trial both related to a "single set of discrete facts" and formed "part of a single course of conduct" with the same "ultimate purpose," *D'Amelio*, 683 F.3d at 419-21.

33

This Court has recognized the flexibility the Government has when proving securities fraud based on the trading of material non-public information. For example, in *United States v. Khalupsky*, this Court found no constructive amendment in a securities fraud case where the Government presented evidence at trial of, among other things, "trades involving target companies that were not identified in the superseding indictment." 5 F.4th at 293-94. In that case, this Court found that "trades involving stocks of other target companies simply served as additional examples of the same conduct constituting the charged scheme." *Id.* The Court continued, "In sum, although 'not specifically pleaded in the indictment, [these trades] are plainly within the charged core of criminality.'" *Id.* at 294 (*quoting United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003)); *see also Salmonese*, 352 F.3d at 621 (no constructive amendment where indictment alleged twenty-five occasions on which conspirators sold inflated stripped warrants as part of fraud conspiracy, and at trial government proved additional, unalleged sales of stripped warrants). Here, unlike in *Khalupsky*, the proof at trial did not even involve different trades than those alleged in the Superseding Indictment—the allegations in the Superseding Indictment and the proof at trial involved the same trades and the same material non-public information.

In support of his argument, Dagar does not cite a single case in which this Court (or any court) has found a constructive amendment of an indictment charging securities fraud based on the trading of material non-public information. Instead, Dagar relies on this Court's decision in *United States v. Zingaro*, 858 F.2d

34

94 (2d Cir. 1988), an inapposite case involving RICO conspiracy and illegal gambling. (Br. 30-32). In that case, "[t]he indictment detailed Zingaro's alleged involvement in Yonkers 'social clubs,' which offered card games and a 'Zigonett' game to players, as well as extortionate loans to cover the players' gambling losses, as the basis both for the predicate racketeering acts and the collection of unlawful debt." *Zingaro*, 858 F.2d at 96. The Government in that case also elicited testimony "concerning a $50,000 loan made by Zingaro" and others to "someone identified as 'George the Greek,'" and "[t]here was no evidence that this loan was in any way connected to the Yonkers social clubs and gambling operations." *Id.* This Court found a constructive amendment because "the indictment alleges only loansharking predicate acts and collection of unlawful debt specifically arising out of Zingaro's involvement in Yonkers social clubs," and "the 'George the Greek' loan did not arise out of the gambling activities allegedly conducted at the Yonkers social clubs." *Id.* at 99.

This case is nothing like *Zingaro*. In *Zingaro*, the Superseding Indictment was narrowly drawn to specific criminal transactions at specific locations (Yonkers social clubs), and the proof at trial broadened the bases for criminal liability by adding a different criminal transaction involving another person ("George the Greek") wholly unconnected to the specific locations and activities charged in the indictment. In this case, the Superseding Indictment was not narrowly drawn with respect to the material non-public information at issue, but, rather, was broadly drawn to cover information about the Paxlovid trial. (*See, e.g.*, A. 34, ¶ 1

35

(MNPI "about clinical trials of Paxlovid"; "MNPI about one of Pfizer's clinical trials of Paxlovid"; "MNPI about the Paxlovid trial"); A. 35, ¶ 3 ("information about the relevant study"); A. 40-41, ¶ 19 ("material non-public information obtained from Pfizer")). Furthermore, unlike *Zingaro*, the allegations in the Superseding Indictment and the proof at trial both involved the same people, the same transactions, the same locations, and the same subject matter—Pfizer's EPIC-HR Paxlovid trial.

Dagar was convicted at trial of the same offense charged in the Superseding Indictment with the same "core of criminality"—trading Pfizer call options based on material non-public information about Pfizer's Paxlovid trial. Accordingly, the Superseding Indictment was not constructively amended at trial.

## POINT II

### The Jury and District Court Correctly Rejected Dagar's Venue Arguments

Dagar next contends that no rational juror could have found, by a preponderance of the evidence, that venue was proper in the SDNY. (Br. 22, 33-51). As Judge Carter correctly concluded, Dagar's "last-ditch effort to challenge the jury's finding of venue by a preponderance of the evidence" fails. (Dkt. 127 at 5). A rational juror could have concluded (1) that acts in furtherance of Dagar's criminal activity occurred in the SDNY, and (2) that Dagar intentionally or knowingly caused such acts to occur in the SDNY or that it was foreseeable that such acts would occur in the SDNY.

36

## A. Relevant Facts

At trial, the Government presented evidence that Dagar's and Bhiwapurkar's November 4, 2021 Pfizer call options trades touched the SDNY in several ways. First, some of the Pfizer call options that Dagar bought, and all of the Pfizer call options that Bhiwapurkar bought, were purchased on Nasdaq options exchanges. (GX 402). The computers that Nasdaq used to match buyers and sellers for these trades are located in New Jersey, but Nasdaq's headquarters and main office are located in Manhattan. (Tr. 519).

Second, some of the Pfizer call options that Dagar purchased on November 4, 2021 were sold to him by a New York, New York brokerage firm—HRT (Hudson River Trading) Financial LP. (Tr. 509, 519, 521; GX 113, 117, 402). HRT Financial is registered to a Manhattan "main address" with the Financial Industry Regulatory Authority ("FINRA") and is likewise listed as having a Manhattan address in SEC "blue sheet" data. (Tr. 509, 519, 521; GX 113, 117, 402).

Third, almost all of the Pfizer call options that Dagar bought, and all of the Pfizer call options that Bhiwapurkar bought, were cleared and settled, on the seller's side, by two clearing and settling firms, Goldman Sachs and Bank of America Securities, in the SDNY. (GX 402).

Joseph Pozzi, the global head of clearing operations at Goldman Sachs, a New York, New York-based financial services firm, testified at trial about how options trades are executed, cleared, and settled, and about the clearing and settling services his group

37

performs with respect to options trades. (Tr. 400, 419-20; GX 116). He explained that a trade begins when someone places an order with a broker to buy or sell an option, and the broker submits that order to an options exchange. (Tr. 419). From there, the options exchange pairs, or matches, a buyer with a seller. (Tr. 419). Once a trade is executed in that way, a trade is cleared, which involves comparing the details of a trade on both sides of the transaction. (Tr. 419). A trade is then settled when cash and securities are exchanged. (Tr. 421). Pozzi testified that "clearing and settling are necessary parts of any options trade." (Tr. 430). They "are 100 percent required. Otherwise the transactions would not be completed[.]" (Tr. 421). Pozzi further testified that there cannot be "an options trade without clearing and settling on both sides of the transaction." (Tr. 421).

Pozzi also explained how, technologically, trades are sent to his team for clearing and settling: after a trade is executed, Goldman's mainframe computer and software packages in Poughkeepsie, New York, which is in Duchess County in the SDNY, receive an electronic transmission with the details of the transaction. (Tr. 422). In this case, Pozzi's team at Goldman cleared and settled some of Dagar's and Bhiwapurkar's November 4, 2021 Pfizer call options trades for the sellers in those transactions, which trades were processed through Goldman's mainframe in Poughkeepsie, New York, in the SDNY. (Tr. 422-27; GX 120, 402).

Peter Melley, the director of FINRA's criminal prosecution assistance group, likewise testified about the necessity of the clearing and settling process.

(Tr. 460-61; *see also* Tr. 507 ("Q. Is the clearing process and settling process a necessary part of any securities trade? A. Yes. It provides for the efficient flow of shares and money among buyers and sellers in the securities markets.")).

Randall Chaflin, who works in the clearing business at Bank of America Securities in New York, New York, also testified about the clearing and settling services his firm provides. (Tr. 611-15; GX 119). Like Pozzi and Melley, Chaflin testified about the importance of the clearing and settling process in options trading. (Tr. 613 ("Q. Are clearing and settling the exchanging of securities and cash necessary parts of any options trade? A. Yes. Q. Can you have an options trade without clearing and settling? A. No.")). Chaflin explained that, while his team's computer servers are not located in the SDNY, if a trade fails to clear and settle, he gets involved from his office in New York, New York. (Tr. 616, 618). In this case, Chaflin's team cleared and settled some of Dagar's and Bhiwapurkar's November 4, 2021 Pfizer call options trades for the sellers in those transactions. (GX 402).

At trial, Judge Carter instructed the jury as follows regarding venue:

> With respect to any given count you are considering, the government, in addition to proving the essential elements of that charge, must also prove that at least one act in furtherance of the charge occurred in the Southern District of New York. This requirement is called venue. The Southern District of New York is the

39

judicial district that includes the follow counties: New York, that is, Manhattan; Bronx; Westchester; Rockland; Putnam; Dutchess; Orange; and Sullivan Counties.

The government does not have to prove that a completed crime was committed within the Southern District of New York, or that the defendant was ever in the Southern District of New York. It is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred in this District. Venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue. The act itself need not be a criminal act. It could include, for example, processing or executing a securities trade within this District. It could also include trading securities on an exchange located in this District. And the act need not have been taken by the defendant, so long as the act was part of the crime that you find the defendant committed. Purely ministerial functions and preparatory acts that are unintended and unforeseeable by the defendant are insufficient to prove venue.

40

> Unlike the elements of the offenses which must be proven beyond a reasonable doubt, the Government is required to prove venue only by a preponderance of the evidence. A preponderance of the evidence means that it is more probable than not that some act in furtherance of the crime you are considering occurred in this District.

(Tr. 965-66).

On February 8, 2024, Dagar moved for a judgment of acquittal, arguing that the Government failed to prove venue in the SDNY. (Dkt. 106). Judge Carter denied Dagar's motion. (Dkt. 127 at 5). He explained that, in *United States v. Chow*, 993 F.3d 125 (2d Cir. 2021), this Court "held that '[w]here the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is appropriate.'" (Dkt. 127 at 5 (quoting *Chow*, 993 F.3d at 143)). "Just as Chow's challenge to venue in the Southern District of New York was foreclosed by the established law of this Circuit," Judge Carter reasoned, "so is Dagar's." (Dkt. 127 at 5 (citing *Chow*, 993 F.3d at 144)). Judge Carter found that:

> At trial, the Government produced evidence that the Defendant traded options on a securities exchange located in Manhattan, that one of the entities that sold Pfizer options to the Defendant is located in Manhattan, that two of the firms that cleared the trades of the Defendant and his coconspirator are located in

41

Manhattan, and that trades made by both the defendant and his coconspirator were cleared and settled through servers located in the Southern District of New York. *See* GX 113; GX 114; GX 115; GX 116; GX 117; GX 119; GX 402. And despite Defendant's arguments to the contrary, it was reasonably foreseeable that when Dagar traded his options contracts in connection with the stock of a New York-based company that trades on the New York Stock Exchange, such acts would occur in the Southern District of New York. The Government presented evidence that Dagar was not an inexperienced or unsophisticated trader as he engaged in thousands of options transactions over a period of years. Tr. 478:22-479:6.

(Dkt. 127 at 6).

## B.  Applicable Law

The proper forum for a criminal prosecution is the district in which the crime was committed. *See* U.S. Const. art. III § 2; U.S. Const. amend. VI; Fed. R. Crim. P. 18. When "the acts constituting the crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue." *United States v. Miller*, 808 F.3d 607, 616 (2d Cir. 2015). Instead, such a defendant may be tried in any district in which some part of the offense occurred. *See, e.g., United States v. Naranjo*, 14

42

F.3d 145, 147 (2d Cir. 1994). And by statute, any offense "committed in more than one district" may be "prosecuted in any district in which such offense was begun, continued or completed." 18 U.S.C. § 3237(a). The Securities Exchange Act of 1934 similarly provides that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. The "transaction constituting the violation" in this context is the "purchase or sale of securities" on the basis of inside information. 15 U.S.C. § 78j(b). Furthermore, "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)).

"[T]he established law of this Circuit" is that "[w]here the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is appropriate." *Chow*, 993 F.3d at 143 (rejecting challenge to SDNY venue where securities were traded on Nasdaq); *see also United States v. Geibel*, 369 F.3d 682, 697-98 (2d Cir. 2004) (rejecting challenge to SDNY venue where securities were traded on the American Stock Exchange "located and headquartered in New York"); *United States v. Riley*, 638 F. App'x 56, 61-62 (2d Cir. 2016) (summary order) (rejecting challenge to SDNY venue where securities "were publicly traded on NASDAQ, located in Manhattan"). Indeed, this Court had made clear that "venue in the SDNY [is] proper" even where "the defendant's only contacts with the

43

district were trades executed on New York-based securities exchanges." *Chow*, 993 F.3d at 143 (describing the holding in *Svoboda*, 347 F.3d at 483). Trades that "utilized the facilities of any New York based securities exchange or brokerage firm" suffice to establish venue. *Geibel*, 369 F.3d at 698; *see also Svoboda*, 347 F.3d at 484 n.14 (noting that the jury was properly instructed that venue could be established through "the execution or settlement of a securities trade within this district").

"Despite its constitutional pedigree, venue is not an element of any crime," so it "need be proved only by a preponderance of the evidence." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). This Court reviews the sufficiency of venue evidence "de novo, considering the evidence in the light most favorable to the government." *Id.* To view the evidence in that light, the Court "draw[s] all inferences in the government's favor and defer[s] to the jury's assessments of the witnesses' credibility." *United States v. Allah*, 130 F.3d 33, 45 (2d Cir. 1997); *accord United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014); *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010).[5] "Venue may be proved by circumstantial evidence." *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016).

---

[5] The Supreme Court recently clarified that improper venue results in, at most, a new trial, not a judgment of acquittal. *See Smith v. United States*, 599 U.S. 236 (2023).

44

## C. Discussion

### 1. There was Sufficient Evidence that an Act in Furtherance of the Charged Crimes Occurred in the SDNY

Here, a rational juror could have found, by a preponderance of the evidence, that an act in furtherance of the charged crimes occurred in the SDNY, based on any of three independent bases.

First, some of the Pfizer call options that Dagar bought, and all of the Pfizer call options that Bhiwapurkar bought, were purchased on Nasdaq options exchanges, which are headquartered in Manhattan. (Tr. 519; GX 402). As Judge Carter correctly recognized, under this Court's binding precedent, that is the end of the matter. *Chow*, 993 F.3d at 143; *Geibel*, 369 F.3d at 697-98; *Svoboda*, 347 F.3d at 483; (*see also* Dkt. 127 at 5 ("Just as Chow's challenge to venue in the Southern District of New York was foreclosed by the established law of this Circuit, so is Dagar's")).

Dagar's attempts to circumvent *Chow* and its predecessors all fail. Dagar begins by offering this Court's decision in *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024) as authority for the proposition that, for venue purposes in a criminal insider trading case, Nasdaq is located in New Jersey because "that is the location of the servers hosting its trading engines." (Br. 36). Not so. To start, *Williams* addressed the extraterritorial application of the securities laws in a private civil lawsuit to trades on Binance, "an online exchange that purports to have no physical location"; it did not address the rules governing venue in a criminal insider

45

trading case. *Williams*, 96 F.4th at 132-33, 138-39. Furthermore, the *Williams* Court concluded that it was appropriate to consider the location of the servers where the transactions at issue in that case matched only because Binance had no "official" location. *Id.* at 137 ("In the absence of an official locus of the Binance exchange, we conclude it is appropriate to locate the matching of transactions where Binance has its servers."); *id.* at 139 ("While it may not always be appropriate to determine where matching occurred solely based on the location of the servers the exchange runs on, it is appropriate to do so here given that Binance has not registered in any country, purports to have no physical or official location whatsoever[.]"). Unlike Binance, Nasdaq does have an "official" location and it is in the SDNY. (Tr. 519; GX 402).

More broadly, Dagar ignores the history of Nasdaq and this Court's jurisprudence when he suggests that, "[w]ith the introduction of electronic exchanges like Nasdaq," the proper venue analysis should focus not on the "physical exchange floors" where trades were traditionally matched, but rather on "the trading engines hosted on the exchange's servers." (Br. 36-37). This Court has, as recently as 2016 and 2021, held that venue exists in the SDNY if the trades occurred on the NASDAQ, which is headquartered in Manhattan, even though NASDAQ has *never* had a physical trading floor and has always been an electronic exchange. *Chow*, 993 F.3d at 143; *Riley*, 638 F. App'x at 62; *see also* Daniel M. Gallager, *Move Over Tickertape, Here Comes the Cyber-Exchange: The Rise of Internet-Based Securities Trading Systems*, 47 Cath. Univ. L. Rev. 1009, 1014 (1998) ("Unlike a traditional stock

46

exchange, such as the NYSE, Nasdaq does not have a physical trading floor; instead, Nasdaq utilizes a computer-based system of trading[.]"). This panel is bound by "the established law of this Circuit," and that law demands that Dagar's venue challenge receive the same result as Chow's. *Chow*, 993 F.3d at 143; *see also United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court.")

Dagar's attempt to narrow this Court's clear language in *Chow*—that "[t]he established law of this Circuit" is that "[w]here the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is appropriate," 993 F.3d at 143—by arguing that this Court must not have meant what it said is ineffective. (Br. 38-40). This language does not restrict venue to where a trade is "executed." It makes no mention of where a trade is executed at all. Venue was proper in *Chow* because the exchange at issue (Nasdaq) was located in the SDNY. Because this case also involves the same exchange as the exchange in *Chow*, the result must be the same as well: venue is proper in the SDNY.[6]

---

[6] A similar issue—whether venue is proper where trades occurred on the New York Stock Exchange, which is headquartered in Manhattan—is currently

47

A rational juror could have also found, by a preponderance of the evidence, that an act in furtherance of the charged crimes occurred in the SDNY on a second, independent ground: some of the Pfizer call options that Dagar purchased on November 4, 2021 were sold to him by a brokerage firm—HRT Financial—located in Manhattan. (Tr. 509, 519, 521; GX 113, 117, 402); *see Geibel*, 369 F.3d at 698 (trades that "utilized the facilities of any New York based . . . brokerage firm" suffice to establish venue). While Dagar argues that "[t]he record was silent as to who at HRT Financial placed the trade and where the trade was placed from" (Br. 41), such proof is not required because "[v]enue may be proved by circumstantial evidence," *Lange*, 834 F.3d at 69. Here, a rational jury was permitted to conclude, by a preponderance of the evidence, that an act in furtherance of the charged crimes occurred in the SDNY based on the circumstantial evidence of HRT Financial's Manhattan location.

While Dagar claims that "sophisticated market participants, such as HRT Financial, also maintain servers in New Jersey to increase execution speed with the exchange's servers," there is no evidence in the record that HRT Financial maintained servers in New Jersey. (Br. 41.) On cross-examination, Peter Melley agreed with Dagar that "big sophisticated market participants can come locate their servers close to the Nasdaq servers" in New Jersey. (Tr. 575). Dagar also asked, "These high-frequency traders like Heartland?"

―――――――

pending before this Court in *United States v. Buyer*, Nos. 23-7202(L), 23-7745(CON).

48

and Melley responded, "Right." (Tr. 575). "Heartland," however, did not sell Dagar any Pfizer call options— HRT Financial did, a point that the Government emphasized on re-direct examination and that Dagar made no attempt to address during a re-cross examination. (Tr. 577 ("Q. Mr. Melley, starting backwards a little bit, towards the end there, Mr. Smith asked you about something called Heartland. Do you recall that? A. Yes. Q. You testified on direct examination about an entity called HRT Financial, correct? A. Correct. Q. And that stands for Hudson River Trading Financial? A. Correct.")). Thus, there was no evidence in the record at trial that HRT Financial executed the trades at issue in this case on servers in New Jersey. And even if there were, that would not hinder a rational jury from finding, by a preponderance of the evidence, that some act in furtherance of the charged crimes occurred in the SDNY based on HRT Financial's Manhattan location.

Finally, the Government also established venue on a third basis with evidence that almost all of the Pfizer call options that Dagar bought, and all of the Pfizer call options that Bhiwapurkar bought, were cleared and settled, on the seller's side, by two clearing and settling firms, Goldman Sachs and Bank of America Securities, in the SDNY, including (in the case of Goldman Sachs) on servers located in the SDNY. (Tr. 422-27, 611-18; GX 116, 119, 120, 402); *see Svoboda*, 347 F.3d at 484 n.14 (noting that the jury was properly instructed that venue could be established through "the execution or settlement of a securities trade within this district").

49

Dagar's argument that clearing and settling are "purely ministerial" was properly rejected by both the jury and the District Court. (Br. 41-42). At Dagar's request, the District Court instructed the jury that: "Purely ministerial functions and preparatory acts that are unintended and unforeseeable by the defendant are insufficient to prove venue." (Tr. 966). As the District Court explained, however, a rational jury could find that, while clearing and settling may have ministerial aspects, they are not "purely" ministerial. (Tr. 642 (noting that the Government was allowed to argue to the jury that even if clearing and settling "have some ministerial aspects, they are not purely ministerial because they are necessary for the processing and/or execution of a trade")).

And to be sure, there was ample evidence in the record from three separate witnesses—Joseph Pozzi from Goldman Sachs, Randall Chaflin from Bank of America Securities, and Peter Melley from FINRA—that clearing and settling are necessary parts of an options trade and not "purely" ministerial. (Tr. 421, 430, 460-61, 507, 613). In fact, the *Chow* Court cited in its venue discussion nearly identical testimony from Peter Melley about the importance of clearing and settling. *Compare Chow*, 993 F.3d at 134 ("Melley testified that both settlement and clearing are [a]bsolutely necessary part[s] of any trade."), *with* Tr. 421 (Pozzi testimony that clearing and settling "are 100 percent required" and that there cannot be "an options trade without clearing and settling on both sides of the transaction"); Tr. 507 (Melley testimony that "the clearing process and settling process [is] a necessary part of any securities trade"); Tr. 613 (Chaflin

50

testimony: "Q. Can you have an options trade without clearing and settling? A. No."). Thus, the clearing and settling in the SDNY was also sufficient to establish venue.

Accordingly, drawing all inferences in the Government's favor, there was sufficient evidence on three independent grounds for a rational jury to find by a preponderance of the evidence that some act in furtherance of the charged crimes occurred in the SDNY.

### 2. There was Sufficient Evidence of Dagar's State of Mind as to Venue

Based on this Court's holding in *Svoboda*, the District Court instructed the jury that "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." (Tr 965-66); *see Svoboda*, 347 F.3d at 483. A rational jury could have found by a preponderance of the evidence that the Government's proof satisfied either prong.

The first prong of *Svoboda* is satisfied because Dagar's knowing and intentional purchase of Pfizer call options caused numerous acts in furtherance of the charged offenses to occur in the SDNY. Specifically, Dagar's knowing and intentional purchase caused (1) securities to be traded on a stock exchange (Nasdaq) located in the SDNY; (2) an entity located in the SDNY (HRT Financial) to sell call options to Dagar; and (3) trades to be cleared and settled by firms (Goldman Sachs and Bank of America Securities)

51

located in the SDNY, including via a mainframe housed in Poughkeepsie, New York, in Dutchess County, New York, in the SDNY. Under the first prong of *Svoboda*, nothing more is required. Dagar's argument to the contrary (*see* Br. 43-45) is wrong.

This Court's decision in *United States v. Royer*, 549 F.3d 886 (2d Cir. 2008), decided five years after *Svoboda*, is instructive. The defendants in that case were charged with racketeering conspiracy and securities fraud (both substantive and conspiracy counts), among other crimes. In short, Amr Elgindy ran a subscription website on which he conveyed misappropriated information from Jeffrey Royer about public companies and then instructed site members to short the companies' stock but not yet release the information to the public. *Id.* at 891. Then, when Elgindy gave the signal, the site members would disseminate the misappropriated information to the public, and thereby profit from the resulting drop in the stock's price. *Id.*

At trial, to establish venue in the Eastern District of New York ("EDNY") with respect to substantive securities fraud counts, the Government relied on the fact that seven of the limited number of site subscribers (between 200 and 300) were located in the EDNY and that Elgindy sent hundreds of messages to site subscribers conveying the misappropriated information. *Royer*, 549 F.3d at 894. In addition, trades in the securities affected by the defendants' manipulative activities were made during the relevant timeframe by investors residing in the EDNY. *Id.*

This Court found venue to be proper with respect to the substantive securities fraud counts for both

52

defendants. The Court reasoned that, "at a minimum, the jury could infer by a preponderance that the subscribers in the Eastern District of New York received information about these stocks from" the defendant, and "[r]eceipt of electronic transmissions in a district is sufficient to establish venue activity there." *Royer*, 549 F.3d at 895.

Similarly, this Court affirmed the propriety of venue with respect to the RICO and securities fraud conspiracy counts. The Court explained:

> In a conspiracy prosecution, venue is proper in any district in which "an overt act in furtherance of the conspiracy was committed." *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir.1994). This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy. *See Svoboda*, 347 F.3d at 483 (stating that venue is proper in a district where the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur). The defendants' transmission of confidential information to the AP site subscribers in the Eastern District of New York, as well as the acts that a reasonable jury could find were more likely than not taken by the AP site subscribers in the Eastern District of New York, are sufficient in themselves to meet this

53

standard for both the securities fraud and RICO conspiracies . . . .

*Royer*, 549 F.3d at 896.

Of note, this Court's decision pointed to no evidence that either defendant *knew* that there were site subscribers in the EDNY or that trades on the affected securities would occur in that district. What was critical to the Court's analysis was that action in furtherance of the crimes took place in the district of venue and that the defendants were the cause of that action. As the Court explained, the actions of the site subscribers "were either caused by Elgindy and Royer or, at a minimum, were a foreseeable result of the defendants' actions." *Id.* at 895 n.10. Thus, *Royer* makes clear that venue is proper in a particular district if (i) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur, and (ii) that act in fact occurs in the particular district.

As set forth above, there can be no question that Dagar intentionally or knowingly caused an act in furtherance of the charged offenses to occur, and that the act in fact occurred in the SDNY. Dagar cites no decision from this Court in support of a contrary result.[7] Thus, the first prong of *Svoboda* was satisfied.

---

[7] Dagar cites the district court's opinion in *United States v. Parrilla*, No. 13-CR-360, 2014 WL 7496319, at *12-13 (S.D.N.Y. Dec. 23, 2014), where the district court's instructions required that the "defendant knew or could have known that the call or text came from or went to the Southern District of New York," but Dagar

54

Even if the first prong of *Svoboda* was not satisfied (and it was), the District Court correctly concluded that the second prong of *Svoboda* was satisfied because "it was reasonably foreseeable that when Dagar traded his options contracts in connection with the stock of a New York-based company that trades on the New York Stock Exchange, such acts would occur in the Southern District of New York." (Dkt. 127 at 6). Indeed, "[t]he Government presented evidence that Dagar was not an inexperienced or unsophisticated trader, as he engaged in thousands of options transactions over a period of years." *Id.*

Here, there was ample basis for the jury to find, by a preponderance of the evidence, that it was foreseeable to Dagar that his trades would involve an act in furtherance of the charged crimes in the SDNY. *See Svoboda*, 347 F.3d at 483 (noting that a "savvy investor" could "reasonably foresee that his trades would likely be executed on" an exchange located in the SDNY); *see also United States v. Riley*, 13 Cr. 339 (RPP), 2014 WL 53440, at *4 (S.D.N.Y. Jan. 7, 2014) (holding that it was it was foreseeable to defendants that securities transactions at issue would occur in this District because "both were experienced in securities trading"); *Khalupsky*, 5 F.4th at 292 (citing "defendants' expertise as traders"). Dagar stated on his Fidelity options trading agreements that he had 15 years' experience trading stock and 12 years' experience with equity options. (GX 101 at 10). He described

_____

cites no opinion of this Court that actually requires such knowledge. (*See* Br. 44-45).

55

his experience with the purchase of put and call options as "extensive." (GX 101 at 11). When opening his Fidelity account, he explicitly acknowledged that Fidelity was a member of the New York Stock Exchange, a fact that was also stamped on his monthly statements. (GX 101 at 11; GX 102). Over the course of five or six years, Dagar executed thousands of options and equities trades. (Tr. 478-79; *see also* GX 103, 108 (Fidelity trade blotter and Robinhood trade blotter reflecting more than 7,000 filled options and equities trades by Dagar)).

For a "savvy investor" like Dagar, it was, as the District Court acknowledged, "reasonably foreseeable that when Dagar traded his options contracts in connection with the stock of a New York-based company that trades on the New York Stock Exchange, such acts would occur in the Southern District of New York." (Dkt. 127 at 6). Tellingly, Dagar does not cite a single case where a court has found that an experienced trader like Dagar is not a "savvy investor" for these purposes. Given Dagar's extensive experience, a rational jury could have found, by a preponderance of the evidence, that it was foreseeable to Dagar that an act in furtherance of the charged offenses would occur in the SDNY. There is thus no basis for this Court to disturb the jury's venue finding.

56

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:    New York, New York
           February 21, 2025

                Respectfully submitted,

                MATTHEW PODOLSKY,
                *Acting United States Attorney for the*
                *Southern District of New York,*
                *Attorney for the United States*
                  *of America.*

JUSTIN V. RODRIGUEZ,
JAMES LIGTENBERG,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,245 words in this brief.

MATTHEW PODOLSKY,
*Acting United States Attorney for the*
*Southern District of New York*

By: JAMES LIGTENBERG,
*Assistant United States Attorney*